**JOHN PETERSON MOTORS, INC., a Minnesota Corporation, and Donald John Peterson, a resident of the State of Minnesota, Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION and General Motors Acceptance Corporation, Defendants.**

Civ. No. 4–85–139.

United States District Court,
D. Minnesota,
Fourth Division.

July 12, 1985.

888

Ronald B. Sieloff, William A. Bierman, Michael Dittberner, Sieloff & Bierman, St. Paul, Minn., for plaintiff.

James S. Simonson, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., and William B. Slowey and Judith Cottier, Asst. General Counsel, General Motors Corp., Detroit, Mich., for defendant General Motors Corp.

Clay R. Moore and Robert S. Lee, Mackall, Crounse & Moore, Minneapolis, Minn., for defendant General Motors Acceptance Corp.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiffs John Peterson Motors, Inc. (JPM) and Donald John Peterson, brought this action against defendants General Motors Corporation (GM) and General Motors Acceptance Corporation (GMAC), alleging violations of federal and state antitrust laws, the Automobile Dealers Suits Against Manufacturers Act (Dealers' Act), 15 U.S.C. §§ 1221–1225, the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and various state laws, including the Minnesota Motor Vehicle Sale and Distribution Regulations Act (Minnesota Motor Vehicle Act), *Minn.Stat.* §§ 80E.01–80E.18, fraud, misrepresentation, breach of contract, promissory estoppel and tortious interference with business relationships. Plaintiffs seek treble damages under the antitrust laws, along with compensatory and punitive damages and injunctive relief. Jurisdiction is alleged under 15 U.S.C. §§ 15, 26 and 1222, 18 U.S.C. § 1964, 28 U.S.C. §§ 1331, 1332, and 1337, and pendent jurisdiction. The matter is now before the court upon the motion of plaintiffs for a preliminary injunction[1] and defendants' motions to dismiss several portions of the complaint for failure to state a claim upon which relief may be granted or for lack of standing, or in the alternative, an order requiring a more definite statement or partial summary judgment.

*Background*

JPM, a Minnesota corporation currently a debtor in a Chapter 11 bankruptcy proceeding,[2] is a GM franchised automobile dealership which sells and services new Oldsmobile, Cadillac, Buick, Pontiac, and Chevrolet motor vehicles. JPM also sells and services used motor vehicles. It is located in Lake City, Minnesota. Plaintiff Donald John Peterson (Peterson), a resident of Lake City, Minnesota, is the President, sole director, and sole shareholder of JPM. Defendant GM is a Delaware corporation engaged in the business of manufacturing and selling the motor vehicles listed above to franchised retail dealers. GMAC, a New York corporation, provides wholesale floor financing and retail financing of new and used motor vehicles.

JPM and GMAC have each submitted an extensive statement of facts and JPM has submitted many affidavits and depositions. GM has also submitted affidavits, but it asserts that the "vast differences" which exist between the parties as to the facts are largely immaterial under applicable law. Since GM's presentation concentrated mainly on the legal issues, the summary of the background to the litigation has been taken mostly from submissions of JPM and GMAC.

1. Subsequent to the hearing, the court issued an order, dated June 4, 1985, which stated that plaintiffs' motion for a preliminary injunction would be denied and that a memorandum opinion and order setting out the court's findings and conclusions would follow.

2. Since this opinion was drafted, the court has learned that the Bankruptcy Court in parallel proceedings involving JPM, the Honorable Robert J. Kressel presiding, has granted GMAC's motion to convert the proceeding into one under Chapter 7.

On October 24, 1980, JPM and GMAC entered into both wholesale floor planning and retail customer financing agreements. Shortly after, JPM entered into five year GM Sales and Service Agreements with the Cadillac, Buick, Oldsmobile, Pontiac, and Chevrolet motor divisions. From late October, 1980 until about February 28, 1983, JPM operated as a "conventional" dealer selling motor vehicles from purchased inventory for a negotiated price with the retail consumer. JPM states that at this time it became apparent that the economy in the local trade area could not support JPM's business and that sales had to be cultivated from other areas.

GMAC contends, on the other hand, that the reasons for JPM's poor financial condition in February, 1983 are attributable solely to internal conditions within the dealership. It states that in the period between December 1982—January 1983, Peterson began a series of lengthy absences from the dealership. According to GMAC, in January of 1983, the financial situation became desperate and the dealership sold several vehicles and delayed payment to GMAC for up to two weeks, a condition referred to as being "out-of-trust," [3] and double-financed one vehicle. See, depo. of Dittrich, JPM's sales manager at that time, p. 67.

On February 28, 1983, JPM launched a new marketing concept commonly known as "$49 over". Traditionally, auto dealers advertise and sell motor vehicles based either on an offered price or on a discount from "sticker price", which is the manufacturer's suggested retail price. In most cases, the factory invoice price, which is the dealer's cost with some modifications, is not disclosed to the retail customer. The "$49 over" concept discloses the amount of factory invoice to any potential customer, and the dealer then adds $49 to that price. JPM states that this approach allows the dealer to quote prices over the phone on any motor vehicle in the GM product line,

reduces dealer costs because little inventory is carried since all motor vehicles ordered from GM are "bona fide pre-sold customer orders," and enables the retail customer to buy a vehicle at a highly competitive price, without the "gimmicks, dickering, and high pressure" found at most retail car dealers. Aff. # 1 of Donald John Peterson, ¶ VII.

GM asserts that this "$49 over" plan conflicts sharply with its marketing strategy. GM believes that it is in its pro-competitive interest to establish a network of local businesses which can provide to potential customers convenient access to sales and service. GM asserts that the nature of cars and trucks as costly, complex, mobile products requires larger capital investment at the retail level, sophisticated pre- and post-sale servicing, promotion and consumer education. Accordingly, it states that the number, location, and size of the dealerships are determined by analysis of each marketing area, and that it allocates the vehicles produced at its factories among its dealers to accomplish its overall marketing strategy. GM asserts that JPM, with its "$49 over" strategy, takes a "free ride" on the full service dealer's service, promotion, and marketing expenditures.

Plaintiffs assert that prior to JPM's adoption of this new marketing strategy, its relationships with GM and GMAC were good. GMAC conducted monthly audits of the dealership inventory, as is commonly done in the auto business. No demands for recapitalization were made, although JPM admits that it was undercapitalized by GMAC standards. Plaintiffs state that JPM was never accused of being out-of-trust before it began the "$49 over" plan, and that GM delivered all cars ordered by JPM.

JPM asserts that its relationship with GM and GMAC changed drastically as soon as JPM implemented its "$49 over" concept. Peterson states that Al Connors, As-

---

3. GMAC asserts that wholesale floor plan financing requires a dealer, upon sale of a car to a customer, to remit to its financing company or bank the amount loaned to the dealer to enable it to buy the vehicle from the factory within, generally, 24 hours of the retail sale.

sistant Zone Manager for Chevrolet, and Jack McKenna, Business Manager for Chevrolet, were "noticeably alarmed" when he first mentioned the "$49 over" program to them in late February 1983.

Plaintiffs have submitted several affidavits which state that Terry Dittrich, JPM's sales manager at that time, received a telephone call or calls from several GM agents around the time JPM began the "$49 over" program. According to plaintiffs, the Assistant Zone Manager for Chevrolet telephoned Dittrich and told him that JPM was in a lot of trouble, that GM did not like the "$49 over" program and that Dittrich "ought to get out while the getting was good." *See* Peterson aff. # 1; aff. of Carol A. Proud. Peterson states that GM told Dittrich that it needed Dittrich's assistance in closing JPM down and implied that Dittrich would get the franchise. Peterson aff. # 1, ¶ IX. Peterson also states that Roland Siembab, Assistant Branch Manager of GMAC, then called Dittrich and solicited financial information from him. Dittrich denied these assertions in his deposition. Peterson charges that GMAC was hoping to find JPM out-of-trust so it could cut off financing to it.

GMAC states that in early March, 1983, while conducting an audit of another dealer in Red Wing, Minnesota, the GMAC auditor, Donald Houck, heard a rumor that JPM was double-financing vehicles, i.e. using the same vehicle as collateral for more than one wholesale floor plan. GMAC asserts that Houck requested an inventory audit of JPM for March 9, 1983, and then met with Dittrich, who had quit JPM on February 29, 1983, approximately one day after the "$49 over" program went into effect, in Lake City. Dittrich told Houck, according to GMAC, that JPM was out-of-trust. Dittrich also said that JPM had taken back one vehicle from a customer who had financed the vehicle with GMAC, resold the vehicle to another customer, and subsequently made payments to GMAC on the customer's behalf. GMAC asserts that these are violations of the terms of the GMAC Retail Plan.

On March 9, 1983 GMAC came to JPM to undertake an audit. The parties' versions of the events and circumstances of the audit differ drastically. Peterson, in his first affidavit, claims that he was virtually held captive in his office and interrogated while agents of GMAC ransacked all of the dealership records. He states that Roland Siembab, Assistant Control Branch Manager for GMAC, announced upon arrival, "This is an official closing!" He states that GMAC employees were on the premises for seven hours and asked him many questions about the "$49 over" plan. Peterson also asserts that GMAC embarrassed him by taking him to the local bank and demanding certified checks for all cars sold. Peterson aff. # 1 at 6, 7.

GMAC, by contrast, states that the audit uncovered major irregularities in documentation and the existence of a large number of car sales. It asserts that ten of the twenty vehicles which had been recently sold by JPM had been sold out-of-trust, and that JPM owed to GMAC a balance of $124,934.14. Due to the magnitude of the problems discovered, GMAC asserts that Houck, its auditor, called his superiors at the branch who requested certification of the checks offered by JPM. Peterson agreed to GMAC's request, but the bank refused to certify one check. Peterson then went to the bank, according to GMAC, and had that check certified. GMAC also states that Siembab, Assistant Control Branch Manager, came to Lake City the afternoon of March 9 to discuss the situation with Peterson. Siembab and Houck deny that Siembab threatened to close the dealership. *See* Houck depo. at 109; Siembab depo. at 66–67, 70. Siembab states that he was primarily concerned that the dealership had enough funds to cover the seven checks which were in the mail to GMAC at that time, totalling $81,744.93. Siembab asserts that he told Peterson that GMAC would be closely monitoring JPM due to the large volume of business and the out-of-trust situation.

GMAC asserts that on March 11, 1983, it was notified by JPM's bank that JPM's

check for $53,366.64 was being returned because it was being drawn on uncollected funds. GMAC obtained a certified check in that amount on March 15, 1983. GMAC then initiated weekly audits and more frequent reviews of JPM's financial statements, justifying this action under the fifth paragraph of the JPM/GMAC Wholesale Security Agreement. Siembab also states that he told JPM that everything would be okay as long as GMAC was paid as the cars were delivered. GMAC ex. 2.

Subsequent to this audit, on April 15, 1983, two of GMAC's branch managers visited Peterson in Lake City to discuss GMAC's reaction to the "$49 over" program. GMAC says Peterson was informed that GMAC did not care how JPM sold its cars, but was only concerned with its ability to pay for them once delivered to the customers. *See* ex. 5 to aff. of Jack T. Parkinson. After this visit, GMAC's Control Branch Manager, J.T. Parkinson sent JPM a letter which estimated, based on JPM's March overhead figures, that JPM must sell 118 units per month to break even under the "$49 over" plan. *See* ex. 32 to Peterson aff. # 1.

Plaintiffs have submitted the affidavits of JPM's employees and customers, as well as testimony of GM employees and GM materials, to show that GM, GMAC and GM dealers have conspired to drive JPM out of business in a variety of ways. They state that several of GM's zone managers came to the dealership in early April 1983 to threaten and coerce it to stop the "$49 over" plan. Peterson states that Ray Grogg, Cadillac Division Zone Manager, told him that he would not "allow JPM to sell every Cadillac in the State of Minnesota." Further, Peterson states that Grogg said that "no matter how many Cadillacs you sold, Cadillac was not going to build them." Peterson aff. # 1 at 7. Similarly, Peterson states that Noel Kruger, Minneapolis Oldsmobile Division Zone Manager, visited in April and threatened "accelerated legal action" if JPM did not discontinue the "$49 over" plan. *Id.* Kruger denies threatening Peterson.

Plaintiffs also charge that GM and GM dealers have interfered with JPM's relations with its customers by suggesting to them that JPM is unreliable and would not deliver the cars in a reasonable period of time. For example, one of JPM's customers, who had ordered a car, wrote GM a letter dated October 23, 1983 in which he states that a Minneapolis Oldsmobile dealer's salesman told him, "Yeah, we've gotten together with the area's coop and GM and we're going to run that $49.00 over place out of business by having the delivery process stretched way out." *See* ex. 8 to Peterson's aff. # 1. Similarly, another customer, Richard Severson, was told by a salesman for Lyndahl Oldsmobile that Lyndahl was a "preferred dealer" which could obtain delivery of any auto within six to eight weeks, while GM would not deliver vehicles to JPM for three to four months after they were ordered. Ex. 9 to Peterson's aff. # 1.

Plaintiffs further state that many of the dealers either refused to perform service and warranty work or have delayed such service because the vehicle was purchased from JPM. *See* ex. 12–17 to Peterson's aff. # 1. Under a dealer's franchise agreement, however, each franchise is obligated to perform such service regardless of where the vehicle was originally sold. GM has submitted affidavits of dealers which deny any refusal to service vehicles purchased at JPM.

In addition, plaintiffs contend that GM refused to allocate and provide cars to JPM in a fair manner despite each division's stated distribution policies. They assert that the various GM divisions promised that they would supply automobiles on a "turn and earn" basis. Under this system, the more cars a dealer sells and delivers, the more it can expect to receive from GM. Plaintiffs state that in addition to GM's written materials, they received verbal assurances from various zone managers that JPM's allocation of new motor vehicles was to be based on its sales. *See* Peterson aff. # 1, ¶ XIX.

Plaintiffs contend that they relied on these assurances and ordered vehicles in increased numbers, while, in reality, JPM's preference was actually being decreased by GM. They state, for example, that in the period beginning in February 10, 1984, Buick was distributing to JPM in accordance to a concept called "planning potential".[4] Plaintiffs assert that "planning potential" is unrelated to distribution, and cannot be located anywhere in the distribution booklet. Similarly, plaintiffs assert that Oldsmobile based its allocation of new vehicles to JPM *solely* on the projected 1984 market for the Lake City area, and gave no consideration to JPM's earned allocation of vehicles pursuant to the Oldsmobile distribution guide. They also charge that Zone Manager Kruger for Oldsmobile knew that JPM had sold-orders that were old and not being filled, but rather than respond to these orders, he arbitrarily limited the preferencing of orders to JPM based on standards that were inconsistent with the Oldsmobile distribution system. *See* pp. 15–18 JPM's Supplemental Argument. Peterson also states that Kruger told him over the phone that he did not care if he sold JPM any Oldsmobiles. Peterson Supplemental Argument and Statement of Facts at 20. Kruger did admit in his deposition that a zone manager could prevent a dealer from earning additional vehicles by refusing to preference the vehicles. Kruger depo. at 115–118.

Plaintiffs contend that dealer pressure led to a secret meeting of all zone managers on February 15, 1984, and the sudden and undisclosed change in distribution policies. They cite the deposition testimony of Dittrich, JPM's former sales manager, Houck, a GMAC auditor, Pirtle, Buick Zone Manager, and Kruger, Oldsmobile Zone Manager, to show that each received dealer complaints. According to Houck, Key Cadillac told him it was tired of losing deals to JPM and that it didn't want to lose any more customers to JPM. Houck depo., pp. 47–50. Plaintiffs note that the owner of Key Cadillac is the National Cadillac Dealer Council representative for the Minneapolis Zone. This Council formally recommended in 1984 that Cadillac "take strong, immediate steps to eliminate this image eroding type of advertising." *See* ex. 11 to Peterson's aff. # 1. Pirtle testified that one of the Buick dealers lobbied him on behalf of the Buick dealer group, to reduce the supply allocation of Buicks of JPM.

As further evidence of dealer pressure, plaintiffs cite a letter dated February 8, 1984, from the district manager of the Buick Minneapolis Zone to Zone Manager Pirtle where the manager stated that the "$49 over" advertising is "hurting the gross profit on many car sales" and that "there is an increasing reluctance to service cars purchased from John Peterson Motors, Inc." The district manager stated that it was "becoming increasingly difficult to conduct normal business with dealers and sales people due to the strain created by the perception that Buick and General Motors are doing nothing to improve the situation.... Strong feelings continue to mount, and tempers sometime flair. It is something that needs to be addressed by upper management."

Plaintiffs contend that this pressure culminated in the secret meeting of February 15, 1984. They cite an inter-organizational letter, dated February 3, 1984, from D.W. Hudler, GM's General Director, Sales Operations, to all Minneapolis Zone Managers. This letter stated that a meeting would be held "[a]s a follow up to Jim Cubbin's conference call late last year to Zone Managers concerning '$49.00 dealers'". The letter continued, "This meeting is being held to make sure we are all aware of the latest situation and to establish a plan of action so that we may properly respond to

---

**4.** In a letter to JPM dated November 19, 1982, the Assistant Zone Manager of Buick explained that the "planning potential" number is based on actual new car and/or truck registration in the dealer's specific geographic area of primary sales and service responsibility. The letter went on to state that "planning potential" is not a "sales objective and does not accurately forecast a particular dealer's estimated new sales in a particular year." Ex. 8 to JPM's Supplemental Argument.

a written request from John Peterson's attorneys." Plaintiffs state that before this meeting JPM's preference was growing, but after the meeting, its allocations were reduced.

In addition, plaintiffs maintain that the conspiracy against them not only made it difficult for JPM to obtain delivery of vehicles for retail sales, but that it also had problems making fleet sales.[5] In particular, plaintiffs allege that in August 1984, the Zone Manager for Cadillac, Ray Grogg, intentionally reversed a bona fide fleet sale by JPM for General Electric Credit Auto Lease Corporation (GECAL).[6] JPM states that it had a lessee to lease from GECAL and that it placed a fleet order for a 1985 Cadillac Seville on August 21, 1984. The ordered Cadillac was immediately preferenced for production by the Fleet and Leasing Department in Detroit, but subsequently unpreferenced by the Minneapolis Zone. *See* ex. 21 to Peterson aff. #1. In separate responses to JPM's questions about why the preference was changed, Grogg and David John, Director of Fleet Leasing for Cadillac, stated that the GECAL code JPM had used was reserved exclusively for the use of General Electric Co. (GE) when ordering vehicles for its use or the use of its subsidiaries. JPM asserts that when its employee, Bruce Johnson, checked on this explanation with the fleet manager of a larger Cadillac dealer, Joseph Todd, in Illinois, Johnson was told that it was false and that there was no distinction between leases for vehicles to be used by GE and those to be used by retail customers. *See* aff. Bruce Johnson. Further, Todd stated that the situation between Cadillac and JPM was "political" and offered to place the orders for the six bona fide Cadillac fleet leases JPM states that it had at that time. Todd then placed those orders using the same GECAL fleet number. *See* ex. 22 to Peterson's aff. #1. By January 1, 1985, at least two of these vehicles had been delivered to the customers. Peterson aff. #1, p. 11.

Finally, plaintiffs maintain that part of the conspiracy was to use GMAC as the "enforcer" to find JPM out of trust and thus cut off financing. They assert that GMAC initiated a meeting in January 1984[7] to discuss granting JPM a larger credit line than its then current limit of 45 units. At the meeting, plaintiffs state that GMAC officials noted a rise in deliveries to JPM by GM and stated that these deliveries were to increase further in the future. It was then decided that JPM needed a 95 to 100 unit credit line based upon these projected sales and a 125-unit line in the future. GMAC indicated that this credit line would have to be backed up by additional security, including personal security from plaintiff Peterson. Peterson states that he agreed to provide additional personal security because of GM and GMAC's representations that additional vehicles would be delivered in the future. Peterson aff. #1 at 13. He also states that GMAC knew that GM would not be increasing deliveries and that GMAC made the demand because it expected that Peterson could not meet it or because it wanted to tie up Peterson's limited assets so he would be unable to arrange alternative financing. *Id.*

---

5. A fleet sale is a sale made by a franchised GM dealer to a company that purchases a minimum of ten vehicles per year. GM specially allocates vehicles at the national level for companies that purchase 500 or more vehicles a year, referred to as "superfleets". When a dealer receives an order from one of these companies, the order is preferenced at the national level outside of the normal distribution process. *See* ex. 18 to Peterson's aff. #1.

6. GECAL, a subsidiary of General Electric Corporation, is a national leasing company which buys new motor vehicles for lease to the general

public. GECAL often uses motor vehicle dealers as agents. These agents market new motor vehicles to the general public for lease, execute the paperwork and deliver the vehicle to its ultimate user. Once the paperwork is completed on GECAL's forms, the agent submits these forms to GECAL for payment. GECAL is the registered owner and the lessee makes monthly payments to GECAL. JPM states that it is an authorized agent for GECAL.

7. GMAC states that the meeting took place in December 1983.

GMAC, by contrast, states that the meeting was held because JPM consistently was exceeding its credit line. For example, in November 1983, JPM went over limits on its GMAC credit line by buying 59 units and financing them through GMAC on a 45-unit credit line. In December 1983, GMAC asserts that JPM had 79 units outstanding on its limit of 45 units. GMAC states that it was concerned because JPM had a low net worth but high customer deposits. This combination, according to GMAC, raised the possibility that customers would demand a return of their funds and place JPM in a serious cash-deficiency situation. A second purpose of the meeting, according to GMAC, was to establish an escrow account for the customer deposits.

GMAC charges that in February 1984 it learned that JPM was making gross misrepresentations in its financial statements by counting revenues received from cars in one month that were not delivered until the following month. In March 1984, GMAC states that an escrow of customer funds was no longer probable because of the severe cash drain that such an account would have on JPM. Additional security was given and in May 1984, JPM's credit line was officially increased to 125 units. GMAC states that in June, JPM sold 104 units but suffered a loss of $10,000 and had several overdrafts. JPM told GMAC he had to refund $43,000 to customers for cancelled orders. *See* ex. 24 to aff. of Jack T. Parkinson.

Plaintiffs state that between January to July 1984, GM delivered only an average of 110.71 vehicles per month even though the break-even point in the "$49 over" system requires more vehicles. In August—November 1984, monthly deliveries averaged only 53.5 vehicles, according to plaintiffs.

In late October 1984, plaintiffs claim JPM was forced out-of-trust by the severe reduction in shipments of new motor vehicles. GMAC suspended wholesale financing on October 26, 1984 after JPM had issued a total of $154,224.16 in bad checks to GMAC. On October 30, 1984, JPM filed a voluntary petition in the United States Bankruptcy Court.

GMAC is an alleged secured creditor of JPM in the bankruptcy proceeding with a disputed claim of approximately $700,000. As of January 1985, approximately 460 consumers had claims against the bankruptcy estate of the $500 deposit which each had paid.

The Bankruptcy Court, the Honorable Robert J. Kressel presiding, has subsequently heard and decided a variety of motions. The court denied JPM's motion for use of GMAC's cash collateral, and the cash collateral was placed into an escrow account. GMAC subsequently moved for relief from the automatic stay, to convert the action to a Chapter 7 proceeding, and for appointment of a trustee. On February 8, 1985, the Bankruptcy Court ordered the appointment of an examiner with all the powers of a trustee; JPM was, however, allowed to retain the right to pursue this action. The court found, *inter alia*, that JPM was guilty of either fraud, dishonesty, incompetence, or gross mismanagement, although it could not determine which at that point. The examiner, Timothy D. Moratzka, has subsequently filed several reports, and on April 8, 1985, he withdrew JPM's second motion for use of cash collateral. On the same date, the court granted partial relief from the automatic stay by ordering payment to GMAC of $500,000 of its cash collateral. On May 1, 1985, the court denied the motion to restore JPM to the status of debtor in possession, finding that the debtor was not profitable before or after the petition was filed and that debtor's sale of motor vehicles would be unprofitable. The court again concluded that there has been "either fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the Debtor by current management." *In Re John Peterson Motors, Inc.,* 47 B.R. 551, 553 (Bankr.D.Minn.1985). On May 3, 1985, the bankruptcy continued GMAC's motions for relief of stay and conversion to Chapter 7 to June 7, 1985. He set the examiner's motion to convert and

the debtor's motion to remove the examiner for that date as well.[8]

After the bankruptcy filing, motor vehicles ordered by JPM were delivered by GM to local GM warehouses. Cars were sold to the retail customer by JPM which delivered certified funds received from the customer to the GM zone officers. Subsequently, the examiner arranged to deliver JPM's sold-order vehicles to customers through other dealers. JPM is not taking any new orders, but it asserts that it continues to receive numerous inquiries from prospective customers. The number of its employees has been substantially reduced from the 30 which it previously employed. As of April 15, 1985, only four employees were still on the payroll. *See* Second Supplemental Report of Examiner, GMAC's App.D. Nevertheless, JPM asserts that it could be a viable, profitable business if this court would grant its motion for a preliminary injunction. GM and GMAC have filed a motion to dismiss counts I, II, IV, and V of plaintiffs' complaint, and to dismiss plaintiff Donald John Peterson's individual claims in counts I, II, III, V, and VI. Because the motion to dismiss affects the analysis of the motion for a preliminary injunction, it will be discussed first.

*Discussion*

A. *GM's and GMAC's Motion to Dismiss or Alternatively, for a More Definite Statement*[9]

To test the sufficiency of the allegations in plaintiffs' complaint, the court is guided by the liberal standard of construction set forth in Fed.R.Civ.P. 8(f). Rule 8(f) dictates that all pleadings must be construed so as to do substantial justice. Defendants' motion to dismiss for failure to state a claim should only be granted if it appears beyond doubt that plaintiffs can prove no set of facts in support which would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss "is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir.1979), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979).

1. Count One of Plaintiffs' Complaint: Section 1 of the Sherman Act, 15 U.S.C. § 1.

Plaintiffs allege in count I of their complaint that GM, GMAC, their agents and employees, various area GM motor vehicle dealers, local and national dealer associations and GECAL conspired in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, to force JPM to discontinue its operation of a "$49 over" program, or to force JPM out of business entirely. They allege that defendants took various actions in furtherance of a vertical, or alternatively, horizontal, price-fixing conspiracy; a vertical or horizontal conspiracy to allocate geographic territories; and a vertical or horizontal boycott.

Defendants claim that all allegations of a conspiracy between GM and GMAC fail to state a claim because a parent and a wholly-owned subsidiary cannot conspire. They also state that count I should be dismissed because they are incapable of conspiring with their agents and employees as a matter of law, the complaint fails to allege any conspiratorial conduct by GECAL and fails to identify "GM Dealers," "GM Motor Vehicle Dealer Associations" and "Former Employees of JPM" with sufficient specificity. Alternatively, they ask that a more

---

**8.** These motions were subsequently continued by the bankruptcy judge for thirty days, and as previously noted, the bankruptcy judge has now granted GMAC's motions for relief of stay and conversion to Chapter 7.

**9.** Although numerous affidavits and depositions have been submitted, these materials relate mainly to plaintiffs' motion for a preliminary injunction. Because defendants' motion focuses on the legal sufficiency of the pleadings, the court will treat it largely as a motion to dismiss under Fed.R.Civ.P. 12(b)(6), rather than as a motion for summary judgment. Where defendants seek dismissal of the antitrust claims because of lack of evidence, however, their motion will be treated as one for summary judgment.

definite statement be given. Further, defendants argue that dismissal is appropriate because the substantial discovery conducted to date has revealed no evidence to support an antitrust conspiracy.

Plaintiffs admit that a parent and its subsidiary cannot conspire, but claims that GMAC, acting as agent for GM, is independently liable for any antitrust violations committed by it in furtherance of GM's conspiracy with its dealers. They state that their complaint alleges conspiratorial conduct by GECAL and that they have identified the unnamed persons with sufficient particularity to satisfy Fed.R.Civ.P. 8.

■ Construing count I of plaintiffs' complaint in light of the principles of Fed. R.Civ.P. 8, the court finds that dismissal is inappropriate. Defendants are correct in their assertions that the threshold conspiracy element of section 1 of the Sherman Act cannot, as a matter of law, be satisfied by alleging a conspiracy between GM and GMAC. A parent corporation cannot conspire with a wholly-owned subsidiary. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. ——, ——, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984). Nor can a corporation like GM conspire with its own officers or employees. *Id.* at 2741.[10] Plaintiffs have alleged, however, in paragraphs 5, 14, 26, 42, among others, that GM and GMAC conspired with other dealers and GECAL, corporately unrelated entities. Such allegations are sufficient to satisfy the concerted action requirement of section 1.

GMAC claims that plaintiffs have shown no facts suggesting that it independently entered into an antitrust conspiracy with the GM dealers or that it was involved in the alleged conspiracy. It states that the episodes [11] relied upon by plaintiffs to demonstrate GMAC involvement do not show

any facts suggesting that GMAC acted other than unilaterally and independently. Similarly, GM has submitted dealer affidavits and states that, despite the substantial discovery conducted to date, there is no evidence to support an alleged antitrust conspiracy.

Since resort to matters outside the pleadings is necessary, this part of defendants' motion will be treated as one for summary judgment. *See* Fed.R.Civ.P. 12(b)(6). Thus, the court is required to view the facts in a light most favorable to the non-moving party, and the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983); *Ralph's Distributing Co. v. AMF, Inc.*, 667 F.2d 670 (8th Cir.1981). The non-moving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir.1980).

These general standards apply in an antitrust context as well. Where there has been no opportunity for discovery, however, or where it is incomplete, courts have not granted summary judgment on the merits of an antitrust case. *See Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289 (8th Cir.1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976); *Umdenstock v. American Mortgage & Investment Co.*, 495 F.2d 589, 592 (10th Cir.1974).

■ The instant case was begun in January, 1985. While substantial discovery has been undertaken, no discovery deadline has even been set yet. In addition, construing the evidence already produced in a manner which grants plaintiffs the benefit of all reasonable inferences, as it must on this

---

**10.** A corporation may, however, conspire with its agents if the agents are aware of the anti-competitive purpose for which they are being used. *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

**11.** Plaintiffs charge that GMAC, in further of the conspiracy, induced plaintiff Peterson to grant

GMAC an additional security interest in his personal assets and conducted harassing audits. They also stated that GMAC conspired with a former employee of JPM, Terry Dittrich, and that Don Houck, a GMAC auditor, received a complaint about JPM from another dealer.

motion, the court finds that issues of material fact remain. Under these circumstances, dismissal is inappropriate.

■ Further, the court finds that under the liberal standard of Fed.R.Civ.P. 8, the other challenged allegations of count I of plaintiffs' complaint are sufficient. The language of paragraph 42 is adequate to allege conspiratorial conduct on the part of GECAL. While plaintiffs have not specifically named all of the alleged co-conspirators, they are identified with enough detail to provide defendants with notice of the claims. *See, e.g., Christen Inc. v. BNS Industries, Inc.,* 517 F.Supp. 521 (S.D.N.Y. 1981). Additionally, much of the vagueness has already been cured by plaintiffs' memoranda and the discovery which has taken place. Because the court concludes that the names of the co-conspirators have been and will be revealed through further discovery, it finds that a more definite statement is unnecessary. *See, e.g., Nagler v. Admiral Corp.,* 248 F.2d 319 (2d Cir.1957).

2. Count Two of Plaintiffs' Complaint: Section 2(e) of the Clayton Act as Amended by the Robinson-Patman Act, 15 U.S.C. § 13(e).

■ Plaintiffs allege in count II of their complaint that GM discriminated against them in the preferencing and delivery of new motor vehicles. They charge that GM preferenced JPM's competitors' orders within a reasonable time, but preferenced JPM's sold orders only with great delay. Plaintiffs also allege that GM failed to deliver sufficient amounts of vehicles to JPM, but delivered the amounts requested, or nearly so, to other dealers. Defendants deny these allegations, but assert that even if taken as true, such discrimination is not within the scope of section 2(e) of the Clayton Act, 15 U.S.C. § 13(e).

Section 2(e) provides:

It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionately equal terms.

15 U.S.C. § 13(e).

Courts are divided as to whether delivery is a service or facility within the meaning of § 2(e). *Compare Centex-Winston Corp. v. Edward Hines Lumber Co.,* 447 F.2d 585 (7th Cir.1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972) (Section 2(e) encompasses delivery because it prohibits any kind of special favors that affect the resale of a product) *with L & L Oil Co. v. Murphy Oil Corp.,* 674 F.2d 1113 (5th Cir.1982) (delivery is not a service or facility within the meaning of § 2(e)). The weight of authority appears to conclude, however, that § 2(e) was aimed at advertising, merchandising, and other promotional services, and not intended to pertain to delivery. *See L & L Oil Co., Inc. v. Murphy Oil Corp.,* 674 F.2d 1113 (5th Cir.1982); *Purdy Mobile Homes, Inc. v. Champion Home Builders, Co.,* 594 F.2d 1313 (9th Cir.1979); *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Cecil Corley Motor Co. v. GMC,* 380 F.Supp. 819 (M.D.Tenn. 1974); W. Patman, *Complete Guide to the Robinson-Patman Act,* 129–134 (1963); F. Rowe, *Price Discrimination under the Robinson-Patman Act* 365–376 (1962). A review of the legislative history of § 2(e),[12]

---

12. The main goal of § 2(e) of the Robinson-Patman Act was to strengthen the prohibition of unfair price discrimination contained in section 2(a) by prohibiting "secret" discrimination such as sellers providing promotional services or advertising allowances to their favorite customers. *Cecil Corley Motor Co., Inc. v. GMC,* 380 F.Supp. 819, 848 (M.D.Tenn.1974). The Report of the Conference Committee of the House of Representatives, 80 Cong.Rec. 9413–9422 (June 15, 1936) shows that § 2(e) was directed to advertising, rebates and other promotional services. Services such as deliveries were never mentioned. *Id.* at 9418–19.

as well as these precedents and commentary, convinces the court that the scope of § 2(e) does not reach discrimination in the delivery of products.[13] Plaintiffs' allegations in count II must, therefore, be dismissed.

### 3. Count IV: The RICO Claims, 18 U.S.C. §§ 1961–1968

Plaintiffs allege in count IV that the defendants violated three separate sections of RICO, 18 U.S.C. §§ 1962(b), (c), and (d). They charge that "GM, its agents and employees, participated in the conduct of its own and JPM's affairs" by conspiring to use the United States mails to transmit distribution booklets containing "false explicit and implicit representations" of GM's allocation methods. Paragraphs 60–62. Paragraphs 63 through 65 allege that "GM and GMAC, acting as an agent, conduit and co-conspirator for and with GM, acquired and maintained a security interest" in the assets of JPM and Peterson by using the mails to transmit matter containing "false, explicit and implicit representations by GM and GMAC."

Defendants allege that plaintiffs' count cannot stand since they have failed to allege the existence or involvement of an "enterprise" within the meaning of RICO. Plaintiffs counter that GM's authority to allocate vehicles to JPM "constitutes the requisite participation in the operation of JPM" to make JPM an "enterprise" under § 1962(c). Plaintiffs' memorandum, at 23. They further argue that because GM and GMAC allegedly acquired an interest in the assets of JPM and Donald John Peterson, JPM and Peterson are enterprises for purposes of § 1962(b).

18 U.S.C. § 1962(b) makes it unlawful for "any person through a pattern of racketeering activity[14] ... to acquire or maintain ... any interest in or control of any enterprise[15]...." 18 U.S.C. § 1962(c) makes it unlawful for "any person employed by or associated with ... any enterprise ... to conduct or participate, directly or indirectly in the conduct of such enterprises' affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(d) makes it unlawful to conspire to do any of the above.

18 U.S.C. § 1962(b) and (c) proscribe acts of racketeering only when an "enterprise" is involved. RICO is not a recidivist statute with enhanced penalties for acts of racketeering that are elsewhere forbidden in the criminal code. *United States v. Anderson,* 626 F.2d 1358, 1367 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). "The ... enterprise at all times remains a separate element which must be proved[.]" *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). *See also, Bennett v. Berg,* 685 F.2d 1053, 1060 (8th Cir.1982), *adhered to on*

---

**13.** Even if delivery were within the scope of § 2(e), dismissal is proper for several reasons. First, § 2(e) requires that the service or facility relate to the resale of the product by the purchaser as opposed to the original sale from the supplier to the purchaser. *See, e.g., L & L Oil Co., Inc. v. Murphy Oil Corp.,* 674 F.2d 1113 (5th Cir.1982); *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 594 F.2d at 1317 (9th Cir.1979). The alleged discrimination in the instant case involves the original sale of motor vehicles. Second, several courts have found that § 2(e) does not apply when the alleged discrimination involves the initial allocation of products to be delivered, as opposed to the physical delivery of products already sold and allocated. *See Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637 (D.N.J.1980); *see also Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 594 F.2d 1313, 1317–18 (9th Cir. 1979); *David R. McGeorge Car Co. v. Leyland*

*Motor Sales, Inc.,* 504 F.2d 52, 54–55 (4th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975).

**14.** Under RICO, a pattern of racketeering activity requires

> at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity [.]

18 U.S.C. § 1961(5).

**15.** An "enterprise" is defined by RICO to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).

*rehearing,* 710 F.2d 1361 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). In the instant case, plaintiffs' complaint did not properly plead an enterprise.

In addition, a complaint may be deficient for failing to allege sufficiently the required degree of participation in the affairs of an enterprise by the defendants. *Bennett v. Berg,* 710 F.2d 1361, 1364 (8th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). The Circuit Court stated in *Bennett:*

> Mere participation [by the defendant] in the predicate offenses listed in RICO, even in conjunction with RICO enterprise, may be insufficient to support a RICO cause of action. A defendant's participation must be in the conduct of the affairs of a RICO enterprise, which ordinarily will require some participation in the operation or management of the enterprise itself.

710 F.2d at 1364.

Even if the court were to allow plaintiffs' memorandum to cure these pleading deficiencies,[16] the allegations would still, as a matter of law, fail to state a claim upon which relief can be granted. The court finds that plaintiffs can prove no set of facts which would entitle them to relief under § 1962(b). Even assuming that the taking of a security interest falls within this section's prohibition, it is undisputed that GM has never obtained a security interest in any of plaintiffs' assets. The record also clearly shows that GMAC has obtained security interests only in 1980 and in 1984. The primary security interests were acquired by GMAC in 1980 at the beginning of JPM's dealership, long before plaintiffs claim that GMAC did anything unlawful. Plaintiffs cannot assert that the original GMAC agreements were secured unlawfully—these were the agreements that made it possible for JPM to secure financing in the first place. The "pattern

of racketeering activity" necessary to establish a claim under § 1962(b) is defined in § 1961(5) as "at least *two* acts of racketeering activity." *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* —— U.S. ——, —— n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d —— (1985). Even if the taking of the security agreement in mid-1984 is called a "racketeering activity", that event is the only act which occurred during the period that plaintiff claims any unlawful conspiracy. Thus, these allegations fail to state a claim upon which relief can be granted and must be dismissed.

Similarly, the court finds that plaintiffs could prove no set of facts entitling them to relief under § 1962(c).[17] Plaintiffs cannot plead or allege that GM controlled or conducted the common, everyday affairs of JPM, or that the services and facilities of JPM were regularly and repeatedly utilized to make possible the alleged racketeering activity. *See United States v. Carter,* 721 F.2d 1514, 1526 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). A RICO defendant must play a more dominant, active ownership or managerial role than is alleged here. *See Bennett v. Berg,* 710 F.2d at 1364.

For these reasons, the court concludes that count IV must be dismissed in its entirety.

4. Count V: The Minnesota Antitrust Act of 1971, *Minn.Stat.* §§ 325D.49– 325D.66

Defendants argue that the Minnesota Act parallels federal antitrust laws and, absent any Minnesota precedent to the contrary, should be interpreted with reference to those laws and cases under them. They assert that plaintiffs' claims under the Minnesota Act must be dismissed because they fail to allege a cognizable conspiracy between GM and another legal entity. The court has, however, already rejected de-

---

16. The court expresses no opinion as to whether such a cure is proper on a Fed.R.Civ.P. 12(b)(6) motion concerning RICO allegations.

17. The court notes that plaintiffs have cited no authority which involves a plaintiff as the RICO enterprise.

fendants' arguments for the reasons given in its discussion of count I of plaintiffs' complaint.

5. Individual Standing of Plaintiff Donald John Peterson

   a. The Antitrust Allegations in Counts I and V

Plaintiff Peterson in count I and V alleged that defendants' actions damaged his personal and business reputation in the community and his ability to obtain credit, exposed his personal assets to claims by GMAC and other creditors, reduced the value of his stock in JPM, reduced the value of other assets used by or leased to JPM, threatened foreclosure on a mortgage on real estate leased to JPM, and caused him mental pain and anguish.

Defendants allege that plaintiff Peterson has no standing to pursue these antitrust claims. They claim that even if Peterson were harmed individually, these damages were indirect, secondary, and remote. Defendants contend that all of Peterson's alleged damages flow from the alleged damages of JPM because they are based on Peterson's role as sole shareholder, president, and major creditor of JPM. They cite many cases to show that the universal rule is that damages based on such a status are insufficient to confer individual standing. Additionally, defendants maintain that there are compelling reasons for this rule. Among other things, they assert that the cause of action belongs to the corporation, and that, if a shareholder could recover, multiple suits would be encouraged threatening defendants with the possibility of paying duplicative damages.

Plaintiffs concede that the general rule is that shareholders, officers, or employees of a corporation cannot sue for damages sustained by the corporation, but assert that specific factors must be considered in every case. They contend that these factors weigh in favor of standing for Peterson. Plaintiffs state that the risks of duplicative recovery are minimized because Peterson has alleged injury separate from JPM's. Moreover, they claim that Peterson was a direct victim of defendants' alleged illegal practices because the dealership bore his name, and as sole owner and operator, his livelihood and reputation depended on its success. They also allege that he was the recipient of most of the threats, harassments, and attempts at coercion, and that he signed a security interest in his personal assets. Additionally, plaintiffs note that their complaint also seeks injunctive relief and contend that the standing requirements for injunctive relief are more liberal. Finally, plaintiffs argue that dismissal is inappropriate where they have not had a full opportunity to develop a record of Peterson's interest.

■ Section 4 of the Clayton Act, 15 U.S.C. § 15, confers antitrust standing and provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover threefold the damages by him sustained....

*Associated General Contractors v. Ca. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), has enumerated factors to be considered in determining whether the act provides a remedy in specific circumstances. These include the nature of the injury in relation to the purpose of the antitrust laws, the directness of the injury, the potential for duplicative recovery or complex apportionment of damages, and whether the granting of standing is necessary to enforce the antitrust laws.

■ Weighing these factors in the instant case, the court finds that plaintiff Peterson has standing to pursue his antitrust claims. Peterson is the president, sole director and sole shareholder of JPM and the dealership bears his name. The contract he signed with GM recognizes the importance of his services to the corporation in various places and Peterson has granted security interests in his personal assets. Defendants, in arguing against the granting of a preliminary injunction, have urged this court to consider JPM as the

alter-ego of Peterson, claiming that Peterson used it for his own purposes and thus dissipated consumer deposits. They referred the court to the bankruptcy examiner's first report where the examiner found that payments were made by JPM for Peterson's personal expenses. The examiner noted that these payments "indicate that the Debtor [JPM] was utilized by ... Peterson for his own purposes and personal whims rather than as a fully independent business operation." *See* First Report of Examiner in GMAC's Appendices, App. B at p. 12. Under these circumstances, where there is such a unity of interest and ownership that JPM might be properly pierced, the court finds that the usual rule concerning the standing of the shareholders, creditors and employees does not apply.[18] *See, e.g., Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429 (9th Cir. 1979). (President and sole shareholder of corporation did not have standing to pursue antitrust claim, but court specifically noted that no claim or showing had been made that corporation did not maintain its corporate existence separate and apart from president and sole shareholder.)

The injuries alleged by JPM and Peterson flow directly from the alleged violations of antitrust policy. As competitors of other GM dealers, plaintiffs' alleged damages are due to the cut-off of supply and the other alleged activities designed to force them to abandon their "$49 over" plan or entire business. Such injuries are "of the type the antitrust laws were intended to prevent...." *Brunswick Corp. v.*

*Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

Moreover, Peterson may be the only person or entity able to pursue these antitrust claims. To be sure, JPM is a party. As defendants have argued in opposition to plaintiffs' motion for an injunction, however, it appears from the proceedings in the bankruptcy court that JPM is in the last stages of dissolution. JPM now employs only 4 employees and without court order, has little prospects of receiving many more vehicles from GM. The examiner, who has not reviewed the antitrust proceedings before this court, has filed a motion for a Chapter 7 conversion.[19] GMAC is pressing for such a conversion, as well as seeking relief from the automatic stay.[20] If JPM cannot continue suit because of the results of the bankruptcy proceedings and Peterson is denied standing, no one else has incentive to sue to restore competition in the relevant market. *See, e.g., Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1984); *Kolb v. Chrysler Corp.,* 357 F.Supp. 504 (E.D.Wis. 1973). Under these unique circumstances where the corporation apparently has been treated as an alter-ego and where it may not survive bankruptcy proceedings, the potential for duplicative recovery or complex apportionment of damages is minimal. For all of these reasons, the court concludes that Peterson is a person injured by reason of a violation of antitrust laws within the meaning of section 4 of the Clayton Act, 15 U.S.C. § 15, and *Minn.Stat.* § 325D.27.[21]

---

**18.** The court is unpersuaded by defendants' floodgate warning. Situations such as the present one, where the sole shareholder and president may so dominate the corporation as to be its alter-ego, are rare and will not subvert the general rules against shareholder standing.

**19.** The examiner has also stated that he will object to the fee application of JPM's attorneys. *See* First Report of Examiner, GMAC's Appendices, App. B at p. 20.

**20.** As noted before, the bankruptcy judge has now granted these motions.

**21.** *Minn.Stat.* § 325D.27 is similar to section 4 of the Clayton Act, 15 U.S.C. § 15. It provides:

Any person, any governmental body, or the State of Minnesota or any of its subdivisions or agencies, injured by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees.

The only reported Minnesota case to apply the new Antitrust Act, *Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Ass'n,* 294 N.W.2d 297 (Minn.1980), cited several federal cases in support of its analysis. Even accepting defendants' arguments that the Minnesota Act should be interpreted with reference to the federal statute, for the reasons given above, stand-

### b. Count III: Dealers' Act, 15 U.S.C. §§ 1221–1225

Similarly, GM asserts that plaintiff Peterson's individual claims should be dismissed for lack of standing. It claims that the Dealers' Act permits only an "automobile dealer" to sue and that plaintiffs have admitted that the dealer, according to the written agreement with GM, is JPM. Plaintiffs argue that where plaintiff Peterson had such extensive involvement in the dealership and where the suit might not be continued if he is denied standing, Peterson should be a proper plaintiff.

15 U.S.C. § 1222 provides:

> An automobile dealer may bring suit against any automobile manufacturer ... [for] failure ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise....

The Act defines an "automobile dealer" as "any person, partnership, corporation, association, or other form of business enterprise ... operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). A "franchise" is defined as "the written agreement or contract between any automobile manufacturer ... and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." 15 U.S.C. § 1221(b).

■■■■■ If the dealer named in the franchise is a corporation, the general rule is that only the corporation may seek relief under the Act. *See, e.g., Schmitt-Norton Ford, Inc. v. Ford Motor Co.,* 524 F.Supp. 1099, 1106 (D.Minn.1981), *aff'd* 685 F.2d 438 (8th Cir.1982). To determine whether a particular individual has standing to sue under the Act, however, "the term 'automobile dealer' should be given the construction that best serves the congressional purpose of 'supplementing the antitrust laws' and balancing 'the power ... heavily weighed in favor of automobile manufacturers.'" *Lewis v. Chrysler Motors Corp.,*

456 F.2d 605, 607 (8th Cir.1972), quoting the Automobile Dealers Franchise Act of August 8, 1956, Pub.L. 1026, 70 Stat. 1125.

In certain cases, therefore, an individual, not a party to a franchise agreement, has been found to have standing under the Act where his or her participation in a dealership's operation was mentioned in and explicitly deemed essential by the franchise agreement and/or where the individual was the corporate dealership's principal shareholder. *Imperial Motors, Inc. v. Chrysler Corp.,* 559 F.Supp. 1312, 1314 (D.Mass. 1983); *Rea v. Ford Motor Company,* 497 F.2d 577 (3d Cir.1974), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir.1971). Moreover, allowing an individual operating a corporate dealership to proceed is appropriate where denying individual standing "would have ... the effect of negating the protective features of the Act altogether." *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1120 (2d Cir.1975) discussing *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir.1965).

■■■■ As noted above, Peterson is the president, sole director, and sole shareholder of the dealership which bears his name. The defendants assert that Peterson's relationship to the dealership is so intertwined as to make the dealership an alter-ego of Peterson. The sales and service agreement signed by the parties refers to the importance of the owner-manager of the dealership. Finally, there is doubt that after the ongoing bankruptcy proceedings have run their course, any corporate entity will remain to pursue its claims against defendants. Under these unique circumstances, plaintiff Peterson has standing to maintain this action.

### c. The Minnesota Motor Vehicles Sale and Distribution Regulations Act Claims in Count VI.

Defendants argue that *Minn.Stat.* § 80E.17 is patterned after section 4 of the

ing for Peterson is appropriate under *Minn.Stat.* § 325D.27.

Clayton Act, and that Peterson would not have standing under the statute because he was not directly injured. They also assert that the only allegation in which Peterson's name appears charges a violation of *Minn. Stat.* § 80E.12(f), which sets forth unlawful practices against a dealer. Plaintiffs respond by contending that the goals of Chapter 80B are distinct from those of the Sherman Act.

*Minn.Stat.* § 80E.17 provides:

Notwithstanding the terms of any franchise agreement or waiver to the contrary, any person who is injured in his business or property by a violation of sections 80E.01 to 80E.17, or any person injured because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of sections 80E.01 to 80E.17, may bring a civil action to enjoin further violations and to recover the actual damages sustained, together with costs and disbursements, including reasonable attorney's fees.

The court need not decide whether the principles governing standing in antitrust matters apply to Chapter 80B because Peterson would have standing for the reasons already stated.

### B. *Plaintiffs' Motion for a Preliminary Injunction*

■ Plaintiffs ask this court to order GM to allocate, preference, and deliver to JPM all "sold-order" vehicles and an additional 116 vehicles per month. They want these vehicles to be delivered without floor financing, or, alternatively, GMAC to be enjoined to provide floor financing. They also ask that GM be required to communicate to the public that these vehicles are available.[22]

Whether preliminary injunctive relief should be granted depends upon the showing made on the following factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Systems v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981).

Plaintiffs contend that they face irreparable injury because JPM faces destruction of its business unless the requested relief is granted. They assert that an injunction is appropriate because the nature of their losses—lost profits and loss of good will—makes damages difficult to calculate. They have submitted affidavits from customers showing that they have gone elsewhere because of GM's refusal to supply JPM. Plaintiffs also maintain that they will be irreparably harmed if an injunction does not issue, because they will be unable to finance this suit against GM and GMAC.

In addition, plaintiffs assert that the proposed injunctive relief would not unduly burden the defendants, who are large corporations, and would subject them to little risk. In fact, plaintiffs contend that defendants will profit by supplying and financing the requested number of vehicles. They assert that GM has delivered the requested amount of vehicles to JPM previously, that any shortages caused by this increase could be spread out among the large number of other GM dealers, and that both defendants are protected by the supervision of the bankruptcy court.

Defendants, by contrast, assert that plaintiffs have not shown irreparable harm because all of their allegations would be fully compensable by damages. Further, they contend that plaintiffs' claims of irrep-

---

**22.** Plaintiffs' proposed order, first submitted before the parties asked to continue hearing on these motions, also requested that GM be required to notify all its franchised dealers in Minnesota and Wisconsin of their obligation to provide service and warranty work on new GM motor vehicles sold by JPM, to provide JPM with a letter stating that JPM is authorized to make fleet sales, to allocate and deliver any fleet sales made by JPM as expeditiously as fleet sales made by any other GM dealer, and to pay all accounts due JPM promptly. Additionally, plaintiffs seek to restrain GMAC from foreclosing on its alleged security interest in the bankruptcy court or forcing JPM into liquidation. They also seek to enjoin GMAC to finance retail purchases of new motor vehicles for JPM.

arable harm through loss of customer goodwill and inability to continue the litigation are without factual support. They argue that the requested relief would not preserve consumer goodwill because the bankruptcy proceedings have demonstrated that plaintiffs have dissipated consumer deposits, sold vehicles out of trust, lost money on the sale of each car, and lost money each year of operation. Defendants contend that the first report of the examiner further substantiates Judge Kressel's findings that, at the very least, there has been incompetency, or gross mismanagement of JPM's affairs. They assert that the court cannot order competent management. Under these circumstances, defendants maintain that granting this injunction would be futile [23] and would actually harm the plaintiffs more than if denied.

Furthermore, defendants maintain that the balance of harms does not favor plaintiffs. GM claims that the proposed injunction would totally disrupt its distribution system and would force it to give vehicles to a dealer found to be incompetent. GM also claims that it has already delivered vehicles to plaintiffs in excess of what they can accept and that GM has incurred substantial costs through these delays.

GMAC maintains that ordering it to make loans to this borrower under these circumstances is "tantamount to confiscation" of its property. It claims that the quantity of cars sought by plaintiffs would involve financing well in excess of $1 million. It argues that even the most optimistic analysis of JPM's track record under the "$49 over" program, suggests that JPM would continue to lose money even if it were allotted 116 vehicles per month. Thus, GMAC contends that it would inevitably stand to lose the interest on these additional funds and, probably, a portion of its principal as well.

The record currently before the court indicates that JPM's business is in serious jeopardy. There are various reasons for this. Plaintiffs of course, claim it results from defendants' actions while defendants state that it is because of plaintiffs' poor business acumen or misconduct. A fact of life is that significant changes have occurred because of the bankruptcy proceedings which JPM itself initiated last fall. As of April 15, 1985, JPM had only 4 employees on its payroll, could not order new motor vehicles, and was faced with liquidation. The Bankruptcy Court has issued various orders finding, among other things, that JPM was not profitable before the bankruptcy, and that an examiner was necessary because of JPM's mismanagement or misconduct. Plaintiffs did not appeal any of the Bankruptcy Court's actions.

JPM has submitted figures showing that it could turn a profit with the number of vehicles it seeks to have ordered by the court, but the bankruptcy judge and the examiner have rejected those figures. This court will not order such wide ranging measures when it has little assurance that the relief would be effective and when the *Dataphase* factors do not clearly favor plaintiffs. Plaintiffs have their actions for damages so that their harm cannot be said to be irreparable. And antitrust claims hold out the possibility of treble damages.

The balance of harms does not weigh in plaintiffs' favor. Plaintiffs have asked that no bond be required. If the court were to order financing in the amount requested by plaintiffs, GMAC would have over $1 million dollars at risk with only the vehicles themselves as security. At this stage in the proceedings where JPM has, in effect, already ceased doing business and is supervised by an examiner, there appears to be little prospect that it could generate a profit to repay that money. Additionally, GM would suffer substantial harm if such an injunction issued. The injunction would adversely affect its distribution system and require it to incur substantial delivery, advertising, and perhaps financing costs. The court finds, therefore, that the pro-

---

**23.** GM submitted five affidavits from the representatives of its motor divisions to show that over the past 5½ months, it had manufactured and shipped to Minneapolis for JPM more vehicles than JPM has been willing to accept, even though JPM had ordered such vehicles.

posed injunction would decidely injure the defendants without clearly benefiting the plaintiffs.

At this stage in the proceedings, it is difficult to determine whether plaintiffs can prevail on the merits of their surviving claims. The parties have devoted many pages in particular to the antitrust claims, but resolution of those allegations depends upon further development. The record shows that plaintiffs have raised substantial questions which call for more thorough exploration. Such a showing does not justify issuance of an injunction, however, where the other equities are not in plaintiffs' favor. *See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981).

Plaintiffs maintain that the public interest would be best served by issuing the injunction. Specifically, they assert that the general public has an interest in preventing the demise of an ongoing business, receiving lower prices in the automobile industry, and vindicating the federal antitrust laws. Plaintiffs also note that the consumers who have already placed orders have an interest in receiving their vehicles at JPM's lower prices.

Defendants, on the other hand, contend that the public interest would be thwarted by issuance of an injunction. They claim that plaintiffs seek to circumvent the jurisdiction of the bankruptcy court and the scope and purpose of the Bankruptcy Code. Defendants assert that the Bankruptcy Court, following procedures set forth by Congress to protect public interest, has acted to protect all creditors, including approximately 465 consumers claiming refunds on deposits. They contend that the public interest is not served by forcing them into a relationship where additional customers and unsecured creditors would continue to provide funds to an insolvent operation.

Both sides have raised valid points of public concern. The public does have an interest in increased competition in the automobile industry and resulting lower prices. The public also has a legitimate interest, however, in preserving the bankruptcy regulatory scheme and in preventing further financial loss to consumers and creditors.

In sum, plaintiffs have not shown that the *Dataphase* factors weigh in their favor or that their motion for an injunction should be granted.

### ORDER

Accordingly, based on the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that

1. The motion of defendants to dismiss counts I and V, or alternatively for summary judgment of those counts or an order requiring a more definite statement is denied.

2. The motion of defendants to dismiss counts II and IV for failure to state a claim is granted, and these counts are dismissed.

3. The motion of defendants to dismiss the claims of Donald John Peterson for lack of standing on counts I, III, V, and VI is denied.

4. The motion of plaintiffs for a preliminary injunction is denied.