Thomas G. LOVETT, Jr., Trustee of the Bankruptcy Estate of John Peterson Motors, Inc., and Donald John Peterson, individually, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

Civ. No. 4–85–139.

United States District Court,
D. Minnesota,
Fourth Division.

June 4, 1991.

## ORDER

DOTY, District Judge.

This matter is before the court on the following motions:

1. Defendant's motion for a judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50 or in the alternative for a new trial pursuant to Federal Rule of Civil Procedure 59; and

2. Plaintiffs' motion for costs and attorneys' fees pursuant to 15 U.S.C. § 15(a), D.Minn. LR 54.3(b) and the judgment of January 3, 1991.

Based on a review of the file, record, and proceedings herein, the defendant's motion for judgment n.o.v is granted as it relates to Donald John Peterson and denied as it relates to John Peterson Motors, Inc. Its motion for a new trial is denied and plaintiffs' motion for costs and attorney's fees is denied without prejudice pending appeal.[1]

## BACKGROUND

Plaintiffs John Peterson Motors, Inc. ("JPMI"), represented by the trustee in bankruptcy, Thomas J. Lovett, Jr., and Donald John Peterson ("Peterson") commenced this action in 1985 against General Motors Corporation ("GM"),[2] asserting several common law claims and violations of various federal and state statutes.[3] The background facts have been set forth in an order dated July 12, 1989. *John Peterson Motors, Inc. v. General Motors Corp.*, 613 F.Supp. 887 (D.Minn.1985). In summary, JPMI was an authorized General Motors dealer in Lake City, Minnesota for Cadillac, Buick, Oldsmobile, Pontiac and Chevrolet motor vehicles. Between October 1980 and

Timothy Dean Moratzka, MacKall Crounse & Moore, Minneapolis, Minn., Ronald B. Sieloff, Sieloff & Bierman, St. Paul, Minn., Michael D. Dittberner, K. Worner Kissoon Law Office, Minneapolis, Minn., John Alexander Cochrane, Stewart C. Loper, Cochrane & Bresnahan, St. Paul, Minn., for plaintiffs.

James Stuart Simonson, James F. Carroll, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., S. Thomas Wienner, Dykema Gossett Spencer Goodnow & Trigg, William B. Slowey, Asst. Gen. Counsel, GM Corp Legal Staff, Detroit, Mich., Clay Randolph Moore, MacKall Crounse & Moore, Minneapolis, Minn., for defendant.

---

**1.** *See, e.g., National Farmers' Org., Inc. v. Associated Milk Producers, Inc.,* 850 F.2d 1286, 1312 (8th Cir.1988) (approving district court's delay in the determination of costs and attorney's fees pending appeal).

**2.** Plaintiffs also brought claims against General Motors Acceptance Corporation but its motion for directed verdict was granted at the close of all evidence.

**3.** Specifically, the complaint asserted violations of the Sherman Act, 15 U.S.C. § 1, and the

Minnesota Antitrust Act, § 325D.49, *et seq.;* the federal Automobile Dealers Day in Court Act, 15 U.S.C. § 1221 *et seq.;* the Minnesota Motor Vehicle Sale and Distribution Regulations Act, Minn.Stat. § 80E.01 *et seq.;* the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.43 *et seq.;* common law fraud, promissory estoppel, tortious interference with business relationships, breach of the dealer sales and service agreements and violations of the Robinson–Patman and RICO Acts.

February 1983, JPMI operated as a conventional dealer, selling motor vehicles from purchased inventory to retail customers for negotiated prices. In February 1983, JPMI changed its sales and marketing strategy and began to engage in a "$49 and over" marketing program. Instead of advertising and selling motor vehicles at prices negotiated with each individual customer based on a list price, JPMI began to sell all automobiles at $49 over its dealer invoice price.

At trial, plaintiffs contended that prior to the change in marketing, the dealership had few problems and its relationship with GM was amicable. After JPMI adopted a $49 and over marketing strategy, plaintiffs claimed that JPMI began to have trouble obtaining cars from General Motors, that GM failed to preference cars ordered by JPMI, and that as time went on JPMI had to wait longer and longer for delivery. Plaintiffs further claimed that the problems arose after various Twin Cities' General Motors dealers pressured GM to take action against JPMI and conspired with GM to fix prices of motor vehicles at $200 to $300 above invoice prices. Plaintiffs maintained that GM accomplished the price fixing by substantially reducing JPMI's allocation of automobiles, thereby minimizing the dealership's ability to turn a profit at the lower price or to compete effectively with the Twin Cities' dealers. Plaintiffs argued that GM thus sought to force JPMI to discontinue its marketing program and instead comply with the marketing strategy used by the Twin Cities' dealers, who sold automobiles on a negotiated basis using list prices plus markups of $200 to $300.

■ The case went to the jury on two claims: (1) violation of Section 1 of the Sherman Act; and (2) failure to perform according to the terms of JPMI's sales and service agreements. The jury found that GM did not fail to perform in good faith the terms of the sales and service agreements but found that various General Motors dealers formed an antitrust conspiracy which GM knowingly joined. As a result of this conspiracy, the jury found that JPMI suffered damages of $986,000, which after trebling resulted in a judgment of $2,958,000. The jury further found that Donald John Peterson suffered individual losses of $266,200 which trebled resulted in damages of $798,600.[4] Plaintiffs seek costs and attorneys' fees pursuant to the Sherman Act. General Motors moves for a judgment n.o.v. or in the alternative for a new trial.

## DISCUSSION

■ The standard for granting a judgment n.o.v. is the same as that for a directed verdict: whether a reasonable juror could have reached the verdict on the evidence presented. *City of Omaha Employees Betterment Ass'n v. Omaha*, 883 F.2d 650, 651 (8th Cir.1989) (citation omitted). The court is "not free to weigh the evidence, to pass on the credibility of witnesses, or to substitute [its] judgment for that of the jury", *Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1197 (8th Cir.1982) (citation omitted), but rather views the evidence "in the light most favorable to the party who prevailed before the jury." *City of Omaha Employees Betterment Ass'n*, 883 F.2d at 651 (citation omitted). This means that the court:

(1) resolve[s] direct factual conflicts in favor of the nonmovant, (2) assume[s] as true all facts supporting the nonmovant which the evidence tended to prove, (3) give[s] the nonmovant the benefit of all reasonable inferences, and (4) den[ies]

---

4. General Motors argued that Donald John Peterson as an individual had no standing to bring the antitrust action. Courts generally hold that individuals have no antitrust standing because "other parties that have been more directly harmed" are available to sue. *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986); *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534–35 & n. 31, 103 S.Ct. 897, 906–07 & n. 31, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 466–67, 102 S.Ct. 2540, 2541–42, 73 L.Ed.2d 149 (1982). At the hearing, the court ruled that Donald John Peterson lacked standing to bring the alleged antitrust claim, and thus General Motors' motion regarding Donald John Peterson as an individual was granted and judgment will be entered against him on the antitrust claims notwithstanding the verdict.

the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Pumps & Power Co. v. Southern States Indus., Inc.*, 787 F.2d 1252, 1258 (8th Cir. 1986).

A motion for a new trial is almost entirely within the trial court's discretion, *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980) (per curiam), and:

the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred.

*Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972); *Leichihman v. Pickwick Int'l, Inc.*, 589 F.Supp. 831, 833 (D.Minn.1984). A new trial is not to be granted merely because the court may have reached a result different than that reached by the jury. *Fireman's Fund*, 466 F.2d at 186–87. With these standards in hand, the court will examine each of defendant's grounds for its motion.

1. *General Motors' Claim That the Evidence Was Insufficient to Establish a Conspiracy*

GM first contends that evidence adduced at trial was insufficient for a reasonable jury to conclude that a conspiracy existed between GM and various General Motors dealers to eliminate JPMI's $49 over marketing program and thereby stabilize the price of General Motors automobiles in the Twin Cities area. Plaintiffs, however, proffered sufficient evidence to demonstrate the existence of the alleged conspiracy.

a. Evidence Supporting the Existence of A Dealers' Conspiracy

Plaintiffs proffered sufficient evidence for a reasonable jury to conclude that various Twin Cities GM dealers acted in con-

cert to eliminate JPMI's marketing program. For example, James E. Pirtle ("Pirtle"), GM's zone manager for the Twin Cities' Buick zone, wrote a memorandum to his file on September 27, 1983 recounting his conversation about JPMI with Jack Walser, a Twin Cities' GM dealer ("Walser"). The memorandum states that:

[o]n September 26th, the writer received a call from Jack Walser, president of the Twin Cities Dealers' Advertising Association. Mr. Walser related to the writer the group's displeasure with activities and advertising policies of John Peterson Motors, Inc., Lake City, MN and indicated that the zone should take strong action to correct the problem. He additionally requested a meeting with the Twin City Dealers to discuss the matter.

(Plaintiffs' Exhibit No. 218).[5]

Plaintiffs also introduced a recommendation by the National Cadillac Dealer Council which encouraged the Cadillac Division to take strong steps to eliminate marketing programs like JPMI's and further requested that GM take action to discourage distress advertising. (Plaintiffs' Exhibit No. 214).

Plaintiffs further introduced a memorandum dated February 8, 1984 from Mark Picker, GM's district manager for Buick, to Pirtle, which Pirtle received on February 9, 1984. (Plaintiffs' Exhibit No. 212). The memorandum indicates that comments made by "dealers and salespeople" about JPMI's marketing program were increasing and that it was "becoming increasingly difficult to conduct normal business due to the strain created by the perception that Buick and General Motors are doing nothing to improve the situation." It further notes that a group of service managers also discussed JPMI at a service managers' meeting. The memorandum states that JPMI's marketing activities were "hurting the gross profit on many car sales" in the Twin City area and that JPMI's marketing program "threatens to undermine the oper-

---

5. Plaintiffs introduced another Pirtle memorandum, dated the following day, from which a reasonable jury could also conclude that members of the Twin Cities Dealers' Association were acting in concert. (Plaintiffs' Exhibit No.

211). This memorandum also indicates that Walser, acting on behalf of the association, requested a meeting with Pirtle but that Pirtle refused to discuss JPMI in a meeting with the association.

ation of some dealerships" because Twin City dealers "need a fair gross profit on their car sales to justify their investment" in their dealerships. A reasonable jury could conclude that this memorandum also suggests group activity by the dealers who were concerned about maintaining price levels.

Other evidence also reflects dealers' concern about JPMI's effect on price levels. In a letter to Pirtle dated March 12, 1984, Jack Walser indicated that his dealership had been forced to reduce his gross sales prices $200 to $300 because of JPMI's marketing program. (Plaintiffs' Exhibit No. 213). In this letter Walser also refers to another letter (Defendant's Exhibit No. 670) about JPMI that was written by W.E. Abraham, executive vice president of the Greater Metropolitan Automobile Dealers Association of Minnesota, to the Minnesota Attorney General's office. Abraham's letter, which copied Walser, also indicates cooperative action by General Motors' dealers concerned JPMI's marketing program.[6]

Noel Kruger, the Oldsmobile zone manager, further testified that the $49 and over marketing program produced prices that were about $300 less than the amount that the Twin Cities' dealers were making in gross profit on Oldsmobiles.

The proffered evidence was sufficient to support the jury's affirmative answer to Question 1 of the Special Verdict Form, which stated:

1. Did General Motors Dealers, in an attempt to substantially restrain price competition, conspire to induce General Motors Corporation, or one of its divisions, to reduce the allocation of automobile to John Peterson Motors?

b. Evidence That GM Joined A Dealers' Conspiracy

After finding that General Motors dealers conspired to substantially restrain price competition, the jurors further found that GM knowingly became a member of that conspiracy in Question 2 of the Special Verdict Form. To explain its actions, GM proffered evidence seeking to demonstrate that it had reduced its allocation of motor vehicles to JPMI for valid business reasons that were entirely independent of any dealer complaints or actions and contends that plaintiffs failed to produce sufficient evidence independent of dealer complaints to prove GM's membership in a dealers' conspiracy.

Under *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), evidence of a dealer complaint followed by a manufacturer's action is insufficient as a matter of law to permit a jury to infer the existence of a manufacturer-dealer conspiracy. The *Monsanto* Court ruled that:

> [t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently.... [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'

*Id.* at 764, 104 S.Ct. at 1471 (citations omitted). Although dealer complaints may have some probative value, the burden remains on the plaintiff "to introduce additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy." *Id.* at 764 n. 8, 104 S.Ct. at 1471 n. 8. Conspiracies, however, may be inferred from actions taken. *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914). The character of a conspiracy is to be determined by an analysis of the activities as a whole. *United States v. Patten*, 226 U.S. 525, 544, 33 S.Ct. 141, 145–46, 57 L.Ed. 333 (1913) (citations omitted).

*Monsanto* also recognized that determining a manufacturer's motives is critical, because concerted actions may be prohibit-

---

**6.** Abraham's letter alleges that JPMI's advertising was "deceptive" because it compared Pontiac sticker prices with Buick dealer prices (although the ad did disclose that the Buick prices were $49 over invoice while the Pontiac prices were "MSRP", an abbreviation for Manufacturers Suggested Retail Prices). The letter suggested that "[t]he reason for this 'deception' is that [JPMI did] not have many Pontiacs for sale, but [did] have Buicks."

ed while the same actions, if independent, are permitted. 465 U.S. at 761, 104 S.Ct. at 1469 (citing *United States v. Colgate Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) for the proposition that "[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently").

Plaintiffs did introduce evidence that the automobile dealers complained to GM about JPMI. Walser, the president of Walser Buick and the dealers' advertising association, became so upset about JPMI's marketing program that he called Pirtle, the Buick zone manager, and urged Buick, on behalf of the dealers' association, to take strong action to stop the program. Pirtle previously brought the matter to the attention of the Buick Motor Division, but he refused to discuss the marketing program with Walser. (Plaintiffs' Exhibit No. 218). Another exhibit reflects further contact by Walser on behalf of the Twin City Buick Dealers' Advertising Association urging Pirtle to take action against JPMI. (Plaintiffs' Exhibit No. 211).[7]

Mark Picker, district manager in the Buick Division, also wrote a memorandum to Pirtle, his supervisor, detailing dealer complaints about the $49 and over program. That memorandum discusses the effect that the program was having on other Twin City dealers, including the fact that those dealers were reducing their profit margins as a result of the competition from JPMI. (Plaintiffs' Exhibit No. 212). At about the same time, the Cadillac Dealer Council complained to Cadillac about the $49 and over marketing plan (Plaintiffs' Exhibit Nos. 214 & 215).

General Motors contends that, aside from the evidence of dealer complaints, plaintiffs produced no independent evidence of GM's role in the conspiracy. Plaintiffs, however, proffered sufficient evidence from which a reasonable jury could conclude that GM did not act independently of the dealers but instead joined a dealers' conspiracy. For example, Carol Proud, the

former bookkeeper for JPMI, testified that Doug Thompson, the district manager for GM's Buick Division, told her that as a result of other dealers' complaints to GM, he was no longer responsible for the number of automobiles allocated to JPMI.

Two managers from GM also visited JPMI concerning the marketing program. Noel Kruger, the Oldsmobile zone manager, visited JPMI on April 21, 1983. He discussed the $49 and over marketing program and threatened JPMI with accelerated legal action if the dealership continued the program. According to the testimony of former JPMI's employees Robert Schmidt and Carol Proud, Kruger became so angry with Peterson that he slammed the door and broke the wall on his way out. After the incident and for the first time in twenty-eight years as an employee with GM, Kruger directly contacted GM's legal department about a dealer's activities, specifically JPMI's marketing program. GM's legal department acknowledged the discussion about threatened legal action but claimed that it was merely a misunderstanding between Kruger and Peterson. (Plaintiffs' Exhibit No. 351).

Otto Ray Grogg, the Cadillac zone manager, also visited JPMI. Peterson testified that Grogg told him that the Twin City area Cadillac dealers were extremely upset by Peterson's marketing program and that they wanted JPMI to discontinue the program. Peterson stated that Grogg told him that the metro Cadillac dealers could "buy and sell the entire town of Lake City". Peterson further testified that he wasn't sure if Grogg was speaking on behalf of GM or on behalf of the Twin City area Cadillac dealers.

In February 1984, Don Hudler of General Motors scheduled a meeting with zone managers in Minneapolis to discuss the Peterson situation. (Plaintiffs' Exhibit No. 435). Al Connors, a Chevrolet representative, testified that the purpose of the meeting, which took place on February 15, 1984, was to discuss the JPMI problem and to make sure that all of GM's divisions were "singing from the same hymnal".

---

7. Walser also conceded, prior to a memory lapse, that he may have discussed JPMI's marketing program with the "big brass" from Buick's Motor Division when they came to town. (Walser Deposition pp. 86–87).

A reasonable jury could conclude that evidence presented by various customers also demonstrated that GM's motive in reducing JPMI's allocation was not prompted by independent business factors but rather was intended to substantially restrain price competition in furtherance of the conspiracy. Keith Johnson, who ordered a Buick Park Avenue, testified that he waited nine weeks for delivery from JPMI, then sought to purchase a vehicle from another dealer. Personnel at both Buerkle Buick and Stephens Buick informed him that he could have a new Park Avenue automobile delivered in four to six weeks if he was willing to pay at or near the sticker price. In seeking to determine what had happened to his automobile order, Johnson contacted General Motors directly and was told by Jean McGowan that the car Johnson ordered had not been "preferenced" by JPMI. JPMI had preferenced the car, and when confronted with this fact, McGowan told Johnson "you know what is happening". J. Brooks, another customer of JPMI, ordered a car and was told by other dealers that he could get a car in four to six weeks if he was willing to pay at or near sticker price. He was also told that the Twin Cities' dealers had convinced General Motors "to run JPMI out of business".

Plaintiffs also introduced evidence from which a reasonable jury could conclude that GM cut back on its allocation of cars to JPMI in furtherance of the conspiracy. Carol Proud testified that Doug Thompson, the district manager for the Buick Division of GM, told her that he was no longer responsible for JPMI's allocation because of dealer complaints. In November 1983, a conference call schedule was established among various GM division employees to discuss the $49 and over marketing problem. (Plaintiffs' Exhibit No. 437). During this same time period, James Cubbin, an attorney at GM, developed a list of suggested strategies for handling the "distribution problem." (Plaintiffs' Exhibit No. 436).[8] A memorandum from the Oldsmobile Division further suggested various ways to address the marketing program. (Plaintiffs' Exhibit No. 434).[9] Both suggested that one way to remedy the "distribution problem" was to limit in some manner the distribution of cars to JPMI and other $49 and over dealers.

In early 1984, the Buick Motor Division did begin to reduce JPMI's allocation of cars. A memorandum from William Sanger ("Sanger Memo"), the car distributor for the Twin City Buick zone, indicates that JPMI's Buick allocation had been reduced to the "in line with planning potential" in February. (Plaintiffs' Exhibit No. 511). On March 9, 1984, James Krause, of the Buick Motor Division, wrote to Pirtle advising him of an "imbalance" in the distribution of vehicles in the Minneapolis zone. (Plaintiffs' Exhibit No. 453).[10] Although the cutback actually occurred several weeks earlier, Pirtle advised Donald John Peterson on March 14, 1984, that the supply of automobiles that JPMI would be receiving in the future would be significantly reduced and that Buick would be distributing vehicles to JPMI in accordance with "the requirements of your dealership's Area of Primary Responsibility." (Plaintiffs' Exhibit No. 446).[11] Pirtle also

8. Some of the "strategies" included: limiting the allocations to the discount dealers "based on some measure of market potential in [the] dealer's Area of Primary Responsibility"; limiting allocations based on "dealer's facilities"; limiting sales to the dealer's "Area of Primary Responsibility"; or "[d]o nothing and let market forces solve problem by allowing survival of fittest."

9. The memo noted that subjects to be discussed during upcoming conference calls included:
(A) Any matters relating to pricing are most sensitive and involve anti-trust [sic] problems.
(B) Zones are to distribute cars in keeping with the established distribution procedures and are to be very careful, namely, do not restrict distribution to Dealers or provide extra cars beyond the earned rate.

10. At about the same time, Walser informed Pirtle that because of the decrease in automobile prices resulting from JPMI's marketing program, his dealership was forced to resign from the Twin City Buick Dealers' Advertising Association. (Plaintiffs' Exhibit No. 213).

11. Plaintiffs introduced evidence that communications between Pirtle and Peterson in early February 1984 did not indicate the possibility of any reduction in JPMI's allocation of Buicks. Plaintiffs contended that reductions began almost immediately after Pirtle received the Picker memorandum of February 8, 1984, which

informed Peterson that "[b]ecause we anticipate product demand to continue at relatively high levels for the foreseeable future, I recommend you review carefully your promotional programs." In a March 16, 1984 memo to the file, Pirtle also indicated that he had been instructed to reduce the allocation of vehicles to JPMI. (Plaintiffs' Exhibit No. 452).

Prior to the "distribution" problems, Pirtle told Donald John Peterson in the fall of 1983 that the zone operated on a turnover distribution system. (Plaintiffs' Exhibit No. 83). GM subsequently adopted a new method of distributing automobiles in the zone, based on a factor called "planning potential". (Plaintiffs' Exhibit No. 511). Plaintiffs introduced evidence that planning potential was a factor that GM had never before used to allocate vehicles and argued that GM adopted the planning potential program to confine JPMI's sales activities to its area of primary responsibility around Lake City, Minnesota, thus minimizing the impact that the $49 and over program had on prices charged by other Twin Cities' dealers.

Plaintiffs also introduced evidence that GM sought to conceal the reduction in JPMI's allocation of automobiles. In a telephone conversation with Donald John Peterson on February 8, 1984, Pirtle told Peterson that Buick would continue to preference cars that JPMI ordered. (Plaintiffs' Exhibit No. 562A). The Sanger Memo, which was dated February 9, 1984, indicates, however, that the decision had already been made to cut back Peterson's allocation to be "in line" with JPMI's "planning potential." (Plaintiffs' Exhibit No. 511). Moreover, General Motors told JPMI that it was forced to reduce JPMI's allocation because there was a shortage of vehicles, when in fact the Minneapolis zone had almost a 50 day supply, which was an adequate supply for the zone. (Testimony of Lyman E. Ostlund; Plaintiffs' Exhibits nos. 502E–F). Pirtle also conceded that the zone had a 58 day supply. (Plaintiffs' Ex-

hibit No. 394). Other testimony indicated that a 30 day supply was adequate for the Minneapolis zone. (Testimony of Don Hudler). The zone office also told customers that all of its dealers knew what their allocations would be but refused to tell Donald John Peterson how many of JPMI's automobiles would be preferenced. (Plaintiffs' Exhibit Nos. 339 & 342).

■ Under the *Monsanto* standard, the plaintiffs introduced sufficient additional evidence to support a finding that GM acted in furtherance of the dealers' conspiracy. The jury was entitled to evaluate the credibility of witnesses and draw inferences regarding their motives and actions. Although GM presented evidence that it acted for legitimate business reasons, plaintiffs presented evidence that GM acted with an unlawful purpose and knowingly joined the dealer's conspiracy, and the jury chose to believe the plaintiffs' evidence regarding GM's motives. Viewed as a whole, there was sufficient evidence to establish that GM joined a conspiracy, and the jury so concluded. Therefore GM's motion for judgment n.o.v. or a new trial based on insufficient evidence is denied.

2. *General Motors' Contention That the Rule of Reason is the Correct Antitrust Standard*

■ The court instructed the jury using a per se standard. GM argues, however, that plaintiffs alleged only that GM wrongfully reduced its allocation of motor vehicles to JPMI and that this action is properly characterized as a vertical nonprice restraint which should be evaluated under the rule of reason. Plaintiffs did not prove the requisite elements of a cause of action under the rule of reason and thus GM urges the court to set aside the verdict or grant a new trial.

GM relies on *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), to support its contention that the court should apply a rule of reason standard to the present facts. It argues that *Sharp* recognizes a "presumption in favor of the rule of rea-

detailed the increasing number of dealer complaints. (Plaintiffs' Exhibit No. 212). Donald

John Peterson did not receive actual notice of the reduction until several weeks later.

son" in antitrust cases. *Id.* at 726, 108 S.Ct. at 1520 (discussing the proper "scope of per se illegality for vertical restraints"). GM further contends that in situations like the present one, if the court does not apply the rule of reason, "it is extremely difficult for the manufacturer to convince a jury that its motivation was to insure adequate services, since price cutting and some measure of service cutting usually go hand in hand." *Id.* at 727–28, 108 S.Ct. at 1521 (discussing vertical restraints).

Plaintiffs argue that GM's improperly relies on *Sharp* to support its claim that the present case involves a vertical conspiracy which is subject to the rule of reason. Plaintiffs argue that *Sharp* merely holds that an agreement between a manufacturer and one dealer to terminate another dealer for price cutting is a vertical agreement which is not per se illegal in the absence of evidence which establishes an agreement on price or price level. *Id.* at 735–36, 108 S.Ct. at 1525–26.[12] Plaintiffs contend, however, that GM mischaracterizes the nature of their claims and that the evidence demonstrates an essentially horizontal conspiracy between dealers in which GM joined. Plaintiffs argue that the conspiracy resulted in threatened legal action, heightened audit activity by General Motors Acceptance Corporation and a substantial reduction in JPMI's automobile allocation by Buick Motor Division. Plaintiffs claim that those actions were undertaken to eliminate JPMI's $49 and over program, thereby re-

ducing price pressure on GM dealers in Twin Cities area and allowing those dealers to stabilize prices at or near sticker price. Plaintiffs contend that GM deliberately confuses the purpose of the alleged conspiracy, to substantially restrain price competition, with the method of its effectuation, to decrease JPMI's allocation of automobiles, and thus seeks to apply an inapposite body of law to support its contention that court should apply the rule of reason.

Plaintiffs rely on *United States v. General Motors Corporation* to support their contention that the alleged conspiracy was horizontal. 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In *General Motors*, GM conspired with some of its dealers to stop the sale of automobiles through discount outlets. The Court held that where GM, in response to dealer complaints, elicited an agreement from the dealers not to do business with the discounters, that activity was illegal per se. 384 U.S. 127, 147, 86 S.Ct. 1321, 1332.[13] The Supreme Court stated that:

> inherent in the success of the combination in [*General Motors*] was a substantial restraint upon price competition—a goal unlawful *per se* when sought to be effected by combination or conspiracy.... And the *per se* rule applies even when the effect upon prices is indirect.

*Id.* at 147, 86 S.Ct. at 1331 (citations omitted).[14]

**12.** In *Sharp,* Business Electronics was one of two Sharp dealers in Houston. Sharp provided dealers with published lists of minimum retail prices but did not require dealers to charge those minimum prices or any other specific price. Business Electronics' prices were often below Sharp's suggested retail prices and also below those of Hartwell, the other Sharp dealer in Houston. Hartwell complained about Business Electronics' prices, and ultimately advised Sharp that it would terminate its dealer agreement if Sharp did not terminate Business Electronics' dealership. Sharp subsequently terminated Business Electronics' dealership and Business Electronics brought an antitrust action. The Supreme Court applied the rule of reason standard to the facts in *Sharp* because the agreement between the manufacturer and one dealer to terminate a price cutter constituted a vertical nonprice restraint. The Court held that such an arrangement would not per se illegal unless the surviving dealer surrendered its pricing discre-

tion and agreed to set prices at some level. *Id.* at 726–27, 108 S.Ct. at 1520–21.

**13.** The Eighth Circuit explained that "[a]lthough *General Motors* involved dual conspiracies, retailer-retailer and retailer-manufacturer, the [Supreme] Court's application of the per se rule points to the importance of the underlying horizontal nature of the arrangement. Substance should be more important than form." *Battle v. Lubrizol Corp.,* 673 F.2d 984, 989 (8th Cir.1982) (citation omitted) (district court's subsequent grant of summary judgment for defendant was affirmed on other grounds by an equally divided court in *Battle v. Watson,* 712 F.2d 1238 (8th Cir.1983) (en banc)).

**14.** The Supreme Court noted that the "discount sales undercut the prices at which franchise dealers were able to, or chose to, compete"; that "[d]ealers and their salesmen complained to General Motors about sales lost through inabili-

GM argues that *General Motors* is distinguishable from the present case because the Supreme Court in *General Motors* determined that GM acted in furtherance of a dealer conspiracy by compelling various dealers to take action that they otherwise would not have taken, such as repurchasing vehicles that the dealers had already sold to discounters and agreeing that they would not sell to discount houses in the future. GM argues that this compulsion is absent from the present case because the jury found that GM had made no wrongful demand on JPMI in connection with its sales and services agreements.[15] GM further contends that it made no effort to eliminate JPMI from any market. The jury found, however, that GM reduced its allocation of automobiles to JPMI in an effort to substantially restrain price competition. This reduction may be characterized as action by GM to further a dealer conspiracy, thereby eliminating price competition and confining JPMI to its area of primary responsibility. The *General Motors* Court held that:

> [e]limination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the [Sherman] Act.

384 U.S. at 145, 86 S.Ct. at 1330.

GM further contends that plaintiffs' reliance on *General Motors* is misplaced because antitrust law has changed significantly since that decision. In *Sharp*, however, the Supreme Court specifically acknowledged the continuing distinction between horizontal and vertical restraints, noting that:

> [r]estraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.

485 U.S. at 730, 108 S.Ct. at 1522–23. The Court stated that the conspiracy in *Gener-*

*al Motors* was horizontal because it involved an anticompetitive agreement between dealers (competitors) in which General Motors joined, whereas the agreement in *Sharp* was vertical because it was between noncompetitors or entities at different levels of the distribution system. *Id.* at 734 & n. 5, 108 S.Ct. at 1525 & n. 5 (also distinguishing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–50, 100 S.Ct. 1925, 1927–28, 64 L.Ed.2d 580 (1980) (per curiam) and *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) because they involved horizontal combinations); *but see id.* 485 U.S. at 742–43, 747–48, 108 S.Ct. at 1529, 1531–32 (Stevens, J. dissenting) (arguing that the only distinction between *General Motors* and *Sharp* was that the former involved an agreement between three parties rather than two); Piraino, *Sharp Dealing: The Horizontal/Vertical Dichotomy in Distributor Termination Cases*, 38 Emory L.J. 311, 332–33 (1989) (asserting that "despite its reference to 'demonstrable economic effects,' the Court in *Sharp* actually eschewed a substantive economic analysis of [Business Electronic's] termination in favor of formalistic line-drawing based on the number and relationship of the parties to the conspiracy"). The Supreme Court determined that the agreement in *Sharp* between a manufacturer and one of its dealers to terminate a price cutter constituted a vertical restraint to which the rule of reason should be applied absent "some agreement on price or price levels." 485 U.S. at 735–36, 108 S.Ct. at 1525. The majority in *Sharp*, however, acknowledged that, unlike vertical agreements, horizontal agreements need not set specific price or price levels in order to be per se illegal. 485 U.S. at 733–34, 108 S.Ct. at 1524–25. As one commentator observed:

> [i]n cases involving agreements among competitors, the [Supreme] Court has consistently held that even an indirect

---

ty to meet the discounters' prices"; and that customers chose to do business with the discounters not only because of lower prices but also to avoid the necessity of "haggling over price." *Id.* 384 U.S. at 132 n. 7, 86 S.Ct. at 1324 n. 7.

**15.** GM bases its contention on the jury's negative response to the special verdict questions which asked:

[d]id General Motors Corporation fail to act in good faith in performing any of the terms of the Dealer's Sales and Service Agreements with John Peterson Motors, Inc., such actions amounting to "coercion, intimidation, or threats of coercion or intimidation" toward the plaintiffs?

effect on prices is sufficient to invoke the per se rule. The majority in *Sharp* even acknowledged that fact, stating that horizontal agreements need not set specific price or price levels in order to be per se illegal.

Piraino, *Sharp Dealing*, 38 Emory L.J. at 330 (footnotes omitted).[16] The court further concludes that GM's misconstrues *Sharp* in its efforts to characterize this case as a vertical nonprice restraint be-

cause the statements in *Sharp* on which GM relies refer solely to the proper treatment of vertical restraints. 485 U.S. at 726–28, 108 S.Ct. at 1520–21.[17]

The present case involved no agreement about price or price levels. Following *Sharp*, the court thus had to determine whether the alleged conspiracy was horizontal or vertical in order to apply the correct antitrust standard.[18] *See id.* at 733–34, 108 S.Ct. at 1524–25. If horizontal,

**16.** The commentator specifically relied on: *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (per curiam) (agreement among wholesalers to terminate their practice of extending credit); *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (involving an agreement among competitors to use specific methods of quoting prices which operated as a complete ban on competitive bidding); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (agreement among competitors to buy surplus gasoline in order to prevent prices from falling); *Sugar Inst. v. United States*, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936) (agreement to adhere to previously announced prices in terms of sales).

**17.** GM also argues that "today both horizontal and vertical agreements that directly and indirectly affect (but do not fix) prices are judged under the rules of reason." GM cites various cases to support its argument that even horizontal restraints are now judged by the rule of reason. *See, e.g., Broadcast Music v. Columbia Broadcasting Sys.*, 441 U.S. 1, 23–24, 99 S.Ct. 1551, 1564–65, 60 L.Ed.2d 1 (1979). After *Broadcast Music*, however, the Supreme Court held that a similar agreement was illegal per se, concluding that "since price-fixing agreements ... lack any 'redeeming virtue,' it is conclusively presumed [to be] illegal without further examination under the rule of reason." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650, 100 S.Ct. 1925, 1929, 64 L.Ed.2d 580 (1980) (per curiam).

Recent antitrust cases are difficult to reconcile. As one commentator observes:

[t]he confusion among the cases has been aggravated by the Court's failure to develop a clear theoretical basis for its new approach. The Supreme Court decisions of the late 1970's and 1980's represent a broad philosophical turn in favor of the rights of defendants in antitrust cases. However, each of those cases was decided on its own narrow facts. Few rules of general application emerge from the Court's case-by-case approach. Although in several situations the Court deemed it appropriate to eschew a traditional per se approach in favor of a consideration of the substantive competitive effects of defendants' actions, it never clearly defined which situations require a substantive com-

petitive analysis. It is therefore difficult to distinguish the cases in which the Court has applied a [per se] approach from those in which it has engaged in a more detailed factual inquiry.

Piraino, *Reconciling the Per Se and Rule of Reason Approaches to Antitrust Analysis*, 64 S.Cal.L.Rev. 685, 705–06 (1991).

In analyzing the present case, the court relied on *Sharp*, which explicitly rejects the notion that horizontal and vertical restraints are treated in the same manner:

petitioner contends that since certain horizontal agreements have been held to constitute price fixing (and thus to be *per se* illegal) though they did not set prices or price levels, *see, e.g., Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–50, 100 S.Ct. 1925, 1927–29, 64 L.Ed.2d 580 (1980) (per curiam), it is improper to require that a vertical agreement set prices or price levels before it can suffer the same fate. This notion of equivalence between the scope of horizontal *per se* illegality and that of vertical *per se* illegality was explicitly rejected in [*Continental T.V., Inc. v.*] *GTE Sylvania* [*Incorporated*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) ], *see* 433 U.S. at 57 n. 27 [97 S.Ct. at 2561 n. 27]—as it had to be, since a horizontal agreement to divide territories is *per se* illegal, *see United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 [92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515] (1972), while *GTE Sylvania* held that a vertical agreement to do so is not.

485 U.S. at 733–34, 108 S.Ct. at 1524; *see also* Piraino, *Sharp Dealing*, 38 Emory L.J. at 330 (noting that "[i]n cases involving agreements among competitors, the [Supreme] Court has consistently held that even an indirect effect on prices is sufficient to invoke the per se rule" (footnote omitted)).

**18.** On the facts of the present case, the key inquiry is not whether a price restraint is involved but rather whether the agreement is horizontal or vertical because *Sharp* affirms the fact that historically the per se rule has been applied to horizontal nonprice and price restraints. 485 U.S. at 734–35, 108 S.Ct. at 1524–25 (stating that the Court has applied the per se rule to: horizontal agreements that are deemed price fixing without setting prices or price levels, such as *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–50, 100 S.Ct. 1925, 1927–29, 64 L.Ed.2d 580 (1980) (per curiam); horizontal price fixing

the per se rule would apply, but if vertical, the rule of reason would apply. *Id.*[19] In analyzing whether a particular agreement is horizontal or vertical, the Supreme Court in *Sharp* noted that vertical action does not become horizontal action simply because its effects are horizontal because "all anticompetitive effects are by definition horizontal effects." *Id.* at 730 n. 4, 108 S.Ct. at 1523 n. 4. Thus "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Id.*[20]

After hearing all the evidence, the court determined that plaintiffs presented sufficient evidence so that a reasonable jury could find that a horizontal conspiracy existed and that GM knowingly joined the conspiracy. Following the framework of

*Sharp*, the conspiracy was horizontal because it involved an agreement "among competitors", *id.* at 734 n. 5, 108 S.Ct. at 1525 n. 5 (discussing *General Motors*), and the per se rule was applied in accordance with the *Sharp* Court's acknowledgement that horizontal agreements need not set specific price or price levels in order to be per se illegal. *Id.* at 733–34, 108 S.Ct. at 1524–25; *see also* Piraino, *Sharp Dealing*, 38 Emory L.J. at 330. Moreover, the fact that GM became involved in the conspiracy renders the agreement no less horizontal or anticompetitive. *See, e.g., Sharp*, 485 U.S. at 734 n. 5, 108 S.Ct. at 1525 n. 5; *Arnold Pontiac GMC, Inc. v. General Motors Corp.*, 700 F.Supp. 838, 840–41 (W.D.Pa. 1988). The court thus instructed the jury using the per se standard.[21] The special

---

cases involving explicit agreements, including *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); horizontal agreements to divide territories, such as *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); and horizontal boycotts of a price cutter, including *United States v. General Motors Corp.*, 384 U.S. 127, 140, 143–45, 86 S.Ct. 1321, 1327–28, 1329–30, 16 L.Ed.2d 415 (1966)). The Court noted with approval that all of those cases applied the per se rule because they involved horizontal rather than vertical restraints.

19. *But see* Piraino, *Sharp Dealing: The Horizontal/Vertical Dichotomy in Distributor Termination Cases*, 38 Emory L.J. 311 (1989) (arguing that the Supreme Court should abandon the price/nonprice dichotomy and apply the per se rule when a manufacturer terminates a dealer as a result of pressure by its other dealers).

20. In analyzing hybrid restraints, that is restraints with both horizontal and vertical components resulting from an agreement between dealers and also an agreement between dealers and a manufacturer, the Supreme Court stated that "a facially vertical restraint imposed by a manufacturer only because it has been coerced by a 'horizontal carte[l]' agreement among ... distributors is in reality a horizontal restraint." *Id.* (citing R. Bork, *The Antitrust Paradox* 288 (1978)); *see also* Piraino, *Distributor Terminations Pursuant to Conspiracies Among a Supplier and Complaining Distributors: A Suggested Antitrust Analysis*, 67 Cornell L.Rev. 297, 298 (1982) (stating that "although the form of such a 'mixed termination' conspiracy may be vertical, the competitive purpose and effect of the conspiracy is more similar to horizontal conspiracies that exclude competitors of the conspirators from a market").

21. Using the per se rule comports with the economic justification for the distinction between horizontal and vertical restraints. As one commentator stated:

> [w]hen a manufacturer is not acting for his own competitive purposes in terminating a distributor, but is merely acceding to the desires of one or more of his dealers that a competitor be terminated, it is appropriate to apply the per se rule. Such a termination amounts to a naked restraint of trade with no purpose except stifling competition. In such a case, the *Sylvania* rationale in favor of the rule of reason does not apply. Instead of acting to enhance his interbrand competitiveness, the manufacturer is merely aiding his distributors in a horizontal scheme to limit competition. The dealers initiating the restraint must enlist the manufacturer to participate in the conspiracy in order to effect the elimination of their competitor from the market. The manufacturer's participation lends a superficial vertical appearance to the termination, but the substantive competitive purpose and effect of the termination is horizontal because it has been instigated by the dealers.

Piraino, *Sharp Dealing*, 38 Emory L.J. at 344–45 (footnotes omitted); *see also* 7 P. Areeda, *Antitrust Law* ¶ 1453c (1986), which states that:

> [a] restraint can be vertical in form without being the product of the manufacturer's free choice. He may adopt it in order to retain a particular dealer or group of dealers who demand such restraints on their competitors as a condition of continuing to deal with the manufacturer.
>
> If so, a court would be entirely correct to characterize the agreement that appears to be vertical in form as a restraint on 'horizontal competition.'

*Id.* (citation omitted).

Courts have recognized that "the coerced exclusion of discount rivals from the market place

verdict form asked the jury first to determine if a conspiracy to substantially restrain prices existed between the dealers and the jury answered yes. The jury was asked to find if GM knowingly joined this conspiracy, and the jury found that GM had joined.[22]

In a similar situation, the United States District Court for the Western District of Pennsylvania also applied the analytical framework of horizontal and vertical conspiracies as set forth in *Sharp.* In *Arnold Pontiac GMC, Inc. v. General Motors Corp.,* 700 F.Supp. 838 (W.D.Pa.1988), a case involving a Pontiac dealer, the court concluded that where an association of dealers reached an agreement to restrict the dealer's access to the market, that agreement was plainly horizontal, plainly anticompetitive and illegal per se even though GM joined the conspiracy and only GM had the power to effect the plan. *Id.* at 841–42. In the present case, plaintiffs proffered sufficient evidence for the jury to find that a conspiracy between dealers was designed to substantially restrain prices.[23] Plaintiffs also introduced evidence which indicated that the method GM used to substantially restrain price competition was a reduction of JPMI's allocation of automobiles.[24] The fact that General Motors became involved in the conspiracy to eliminate the $49 over marketing program by

---

solely because of their pricing policies" impairs competition as much as price fixing agreements. *See, e.g., Burlington Coat Factory Warehouse v. Belk Bros. Co.,* 621 F.Supp. 224, 233 n. 18 (S.D.N.Y.1985). GM's actions also may have warned other dealers that the use of marketing programs like JPMI's would not be tolerated. For example:

> [u]nder *Monsanto,* such a signal could be evidence of the manufacturer's attempt to police a general resale price-fixing scheme. The verdict against Monsanto was upheld by the Court partially on the basis of a newsletter to distributors indicating that Monsanto would terminate distributors who did not comply with its policy on resale pricing.

Piraino, *Sharp Dealing,* 38 Emory L.J. at 330 n. 90 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 765–66, 104 S.Ct. 1464, 1471–72, 79 L.Ed.2d 775 (1984)).

GM never terminated JPMI's dealership. The jury found, however, that GM restricted JPMI's allocation of vehicles. Plaintiffs contended that this restriction operated in much the same way as an outright dealer termination because the reduction forced JPMI to either abandon its marketing program, in which case plaintiffs presented evidence to show that it was unlikely that JPMI would be profitable because in the past when it had operated as a conventional dealer it lost money because its area of primary responsibility was too small and economically depressed to sustain a conventional dealer, or JPMI could choose to continue with its marketing program, and eventually go out of business because it would not be able to generate sufficient volume to turn a profit at the $49 over invoice prices.

**22.** GM further argues that the jury questions so worded that it was impossible to produce answers that could support a finding of antitrust liability. The court rejects this contention because the jury instructions followed the Supreme Court's analysis in *Sharp* regarding the distinctions between horizontal and vertical conspiracies and its explanation of why the *General Motors* case involved a horizontal restraint.

**23.** Plaintiffs introduced evidence that demonstrated that JPMI's marketing program operated to decrease automobile prices in the Twin Cities' area and that as a result, the other dealers became very concerned. Arthur Cobb, one of GM's experts, documented the effect that the $49 and over advertising had on the Twin Cities' market and conceded that the program had a downward impact on the price of new General Motor vehicles in the Twin Cities. (Defendant's Exhibit nos. 810–815). Jack Walser, president of the Twin City Buick Dealers' Advertising Association, complained to Pirtle about the fact that JPMI's advertising was forcing other dealers to decrease their prices. (Plaintiffs' Exhibit No. 211). Later, Walser threatened to resign from the Buick Dealers' Advertising Association because his "grosses" were being hurt by $200 to $300. (Plaintiffs' Exhibit No. 213). Mark Picker, district manager for Buick, further noted that JPMI's activities resulted in dealer complaints and had a negative impact on sales people and dealers as well as precipitating a decrease in sales at Twin City General Motors' dealers. (Plaintiffs' Exhibit No. 212). The Cadillac Dealers' Council organization also pressured General Motors to do something to stop "over invoice" pricing. (Plaintiffs' Exhibit No. 215).

**24.** GM reduced JPMI's allocations to be "somewhat in line with planning potential". (Plaintiffs' Exhibit No. 511). Planning potential, however, was a factor never before used by General Motors for allocating vehicles and plaintiffs contend that the planning potential program was adopted in order to confine JPMI sales activities to its area of primary responsibility and minimize the effects of the $49 and over program on prices charged by other Twin City area dealers.

restricting JPMI's access to the market does not transform the arrangement into a vertical conspiracy, nor does it convert the nature of the conspiracy from one designed to substantially restrain prices into a non-price restraint. *Id.* at 841. Because the conspiracy was essentially horizontal and substantially restrained prices, the per se rule is the appropriate standard. *See Sharp,* 485 U.S. at 730 n. 4, 733–34, 108 S.Ct. at 1523 n. 4, 1524–25; *General Motors,* 384 U.S. at 147, 86 S.Ct. at 1331 (citing *United States v. Parke, Davis & Co.,* 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505 (1960); *United States v. Soco-ny–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940); and *Simpson v. Union Oil Co.,* 377 U.S. 13, 16–22, 84 S.Ct. 1051, 1054–57, 12 L.Ed.2d 98 (1914)); *cf. Catalano,* 446 U.S. 643, 645–46, 100 S.Ct. 1925, 1926–27 (applying the per se rule to a refusal to extend credit and reasoning that it constituted price fixing because it was "as plainly anticompetitive as an agreement to raise prices"). Thus, the court rejects GM's argument that the rule of reason was the correct standard.

### 3. *General Motors' Objections Concerning Damages*

General Motors also seeks to attack the damages awarded by the jury. Following the questions concerning the existence of the conspiracy, the special verdict form asked:

> Did the conspiracy, if any, cause injury to plaintiff John Peterson Motors, Inc.? What is the dollar amount which will adequately compensate John Peterson Motors, Inc. for its damage resulting from its injury, if any?

The jury found causation and awarded damages to JPMI of $986,000. GM now attacks the award on two grounds.

#### a. Causation

GM argues that it was not responsible for JPMI's failure as a dealer, rather JPMI's marketing strategy coupled with poor business judgment caused the failure.[25] GM, however, presented extensive evidence to support its claim that JPMI's failure was caused by reasons other than GM's actions. The jury rejected the alternative explanations and found that JPMI's failure was caused by General Motors' actions in reducing the allocation of automobiles.[26]

#### b. Calculation

GM also attacks the amount of the jury award because it contends that plaintiffs failed to present any credible evidence on the issue of damages. It specifically attacks the projections of Douglas W.

---

**25.** GM also argues that causation was not established because the jury found that GM complied with its contractual obligations. The jury, however, only found that GM's actions did not rise to the level of "coercion, intimidation, or threats of coercion or intimidation." This analysis is also flawed because the contract and antitrust claims are not parallel: GM could comply with the letter of its contractual obligations and still be guilty of using its allocation system for an improper antitrust purpose, for example, to fix or stabilize prices.

General Motors further contends that earlier orders of the bankruptcy court are dispositive regarding the reason for JPMI's failure. *See In re John Peterson Motors, Inc.,* 47 B.R. 551 (D.Minn.1985). The court, however, determined that those bankruptcy orders did not conclusively establish the reason for JPMI's failure. First, the orders did not purport to determine the cause of the failure, although the bankruptcy court stated that either "fraud, dishonesty, incompetence or gross mismanagement" was involved. *Id.* at 552. The parties

also did not have the opportunity to fully litigate the causation issue before the bankruptcy court. During trial, both sides presented extensive evidence and had a full opportunity to litigate the cause of JPMI's failure. GM presented extensive evidence regarding the various explanations that were listed by the bankruptcy court. The jury nonetheless determined that GM's actions were a substantial cause of JPMI's failure.

**26.** Moreover, even if other causes contributed to JPMI's failure, damages attributable to GM's antitrust violation are recoverable even though factors other than the antitrust injury may have contributed to the damages. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) (analyzing damages under § 4 of the Clayton Act). A plaintiff is not required to exhaust all possible alternative sources of injury in order to recover damages; it is sufficient that the antitrust violation be a material cause of the injury. *Id.* Jury Instruction No. 22 adequately summarized this standard for the jury.

Helm ("Helm"), one of plaintiffs' experts, and argues that because the calculations of plaintiffs' other experts, Lyman E. Ostlund and Ronald Carlson, were based on Helm's projections, that the testimony of all three witnesses was suspect. Once a plaintiff establishes an antitrust injury, however, the fact that its damages are difficult to ascertain will not preclude an award. The jury is permitted to make "a just and reasonable estimate ... based on relevant data [including] probable and inferential as well as direct positive proof." *See, e.g., Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). All of plaintiffs' expert witnesses, including Helm, relied on actual data from the operation of JPMI's business as a basis for projecting and calculating lost profits. Such lost profits are properly recoverable in an antitrust action. *Reed Bros., Inc. v. Monsanto Co.,* 525 F.2d 486, 499 (8th Cir. 1975). The jury was properly instructed that the fact that JPMI was a new or unestablished business was not fatal to the element of damages. *See, e.g., T.V. Signal Co. v. American Tel. & Tel.,* 617 F.2d 1302, 1308 (8th Cir.1980) (citing *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 988 n. 20 (5th Cir.1977)). Plaintiffs demonstrated that JPMI was profitable during the short period of time in which it was operated as a $49 and over dealer. Arthur Cobb ("Cobb"), an expert witness for GM, testified that a reasonable base period for the calculation of damages was the fiscal year beginning on July 1, 1983 and ending June 30, 1984, during which time JPMI actually engaged in its $49 and over marketing program. Cobb also conceded that if its allocations not been cut off, JPMI could have expected to sell 1,440 vehicles and to earn more than $100,000 in profits per year. The jury may have concluded that GM's calculation of losses was skewed by it included extraordinary losses resulting from JPMI's bankruptcy and legal expenses, losses which plaintiffs argued were caused by GM's illegal activities. GM's damage calculation also included periods of time when JPMI was not engaged in the $49 and over program and when it was in bankruptcy. The jury was free to disregard those periods in calculating damages.

Both sides presented extensive evidence on damages and the jury chose a dollar amount after listening to that evidence. Plaintiffs provided sufficient evidence to prove damages that were neither speculative nor unreasonable and the instructions properly set forth the law regarding. Thus, defendant's objections to the amount of damages are rejected.

### 4. General Motors' Motion for New Trial

General Motors also raises various arguments to support its motion for new trial.

#### a. Evidentiary Matters

GM claims that various evidentiary rulings deprived it of a fair trial on the antitrust issues. GM first contends that, although the court issued a limiting instruction recognizing the inadmissibility of the Brooks's letter (Plaintiffs' Exhibit No. 600) as proof of conspiracy, the letter was irrelevant and inadmissible for any reason. GM also argues that the prejudicial effect of the letter dictated that it should have been excluded under Federal Rule of Evidence 403. The Brooks's letter relates one customer's experience when trying to purchase a new car from JPMI in the Twin Cities' market during the time in which JPMI was engaged in the $49 and over program. It was written contemporaneously with the events surrounding the alleged conspiracy and Brooks sent the letter to GM to express his frustrations over the situation. It bears the hallmarks of the reliability because Brooks had no stake in the litigation and the letter reflects events that he observed at the time. Plaintiffs proffered it not as evidence of the existence of the conspiracy, but rather as evidence regarding GM's motive for reducing JPMI's allocation. GM contended that its actions were prompted in part by its concern for consumers. Plaintiffs argued that the letter demonstrated that GM was aware of one customer's dissatisfaction, yet took no action to correct his problem. Because GM did not even reply to Brook's letter, plaintiffs argued that it was proba-

ble that GM's professed concern for the ultimate consumer as its reason for discouraging the $49 and over program may have been pretextual and that GM's real concern involved the prices that Twin Cities' dealers could charge its customers. The court gave a limiting instruction that the letter was to be considered to establish GM's motives and in light of other evidence which demonstrated the existence of the conspiracy, its probative value outweighed its prejudicial effect.

GM also claims that testimony regarding another alleged conspiracy involving a former employee of JPMI, Terrence Dittrich, also prejudiced the trial. GM concedes, however, that the court instructed the jury to disregard any statements that plaintiffs attributed to Dittrich once the court ruled that Dittrich was not a co-conspirator for purposes of the antitrust claim. Any prejudice to GM was cured by the instruction given to the jury that Dittrich's actions were not attributable to the antitrust conspiracy.

GM further contends that after granting GMAC's motion for a directed verdict, the court improperly instructed the jury that GMAC's conduct could still be attributed to GM for purposes of determining liability under the antitrust laws. Plaintiffs presented substantial evidence that GMAC cut off credit in an attempt to force JPMI out of business. Although GMAC cannot be a co-conspirator with General Motors as a matter of law under *Copperweld Corp v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), GMAC's actions may be attributed to GM, not as a co-conspirator, but as a wholly owned subsidiary acting with apparent authority as agent for GM. *See American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (imposing antitrust liability on principal as a result of agent's acts). Before final arguments, the court warned the jurors that GMAC could not be considered as a co-conspirator. The written jury instructions further warned that

GMAC could not conspire with GM. In its final argument, GM also had the opportunity to comment on any of the evidence concerning GMAC and to emphasize that GMAC could not be a conspirator. Accordingly, the court rejects GM's claim that the jury was improperly instructed concerning GMAC's role in the lawsuit.

### b. Damages

■ GM contends that the special verdict form unnecessarily confused the jury and prejudiced GM because it required the jury to fill out a damage dollar amount regardless of whether GM was liable for any antitrust injury. During the charge conference, however, GM requested and the court inserted the phrase "if any" in the damage instruction to eliminate any prejudice to General Motors by the inclusion of the damages question. The court orally instructed the jury that the damage questions could be filled in with any amount, including zero.[27] Accordingly, the court determines that GM was not prejudiced by the questions requesting a dollar amount of damages in the special verdict form.

GM attempts to argue that the jury's verdict was perverse because Question 4 was filled in with a damage amount while Question 9, which asked for dollar damages, was filled in with a zero. The jury verdict, however, was not perverse. In Question 3, the jury decided that GM's antitrust violation injured JPMI. In Question 4, the jury was asked to calculate the dollar amount of damages that were caused by GM's antitrust violation and it found those damages equalled $986,000. In question 9, the jury was asked to insert a dollar amount for damages which flowed from a violation of JPMI's sales and services agreements. Because the jury determined that GM did not violate the terms of those agreements in Question 7, it awarded no damages on that claim in Question 9. The verdict is therefore wholly consistent with the special verdict form and the instructions given by the court.

27. The court further notes that Minnesota federal courts commonly ask the jury to determine a dollar amount of damages resulting from a given event without regard to whether a defendant was liable for the event to minimize the risk of retrial after appeal.

GM also contends that plaintiffs' experts were improperly allowed to include pre-judgment interest in their damage calculations. GM, however, consistently mischaracterizes the type of interest that the court permitted plaintiffs' experts to include in their calculations. The interest included was not prejudgment interest but rather an amount that reflected what JPMI's alleged lost profits would have earned if such funds had been invested and adjusted for inflation. The interest thus represented plaintiffs' experts estimate of the present value of plaintiffs' lost profits, not a statutory claim for prejudgment interest and as such, the amount was properly included in the damage calculations. *See, e.g., H.J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir.1989) (determining that the proper measure of antitrust damages is the present value of lost profits); *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 996 (5th Cir.1983) (permitting an expert to express a past damage figure in terms of present value for purposes of calculating antitrust damages and rejecting the argument that such calculations amounted to nothing more than prejudgment interest because the calculations were based on economic theory and not as a claim for statutory or common law prejudgment interest); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 987 n. 20 (5th Cir.1977) (affirming a net present value judgment to a claim for lost capital in a private antitrust suit). Therefore, plaintiffs' experts did not calculate prejudgment interest, they merely calculated the present value of losses sustained by JPMI. In doing so, they discounted the future earnings back to 1983 then calculated a damage amount in 1990 dollars. GM's assertion that the jury award included prejudgment interest is thus totally unfounded.

GM also attacks the jury award by arguing that damages should not have been calculated after 1985, because JPMI's dealer sales and service agreement would have expired in 1985 and its renewal was uncertain. GM's assertion that JPMI's agreement would not have been renewed in 1985 is contrary to the evidence. Peterson testified that during all of his years in the

automobile business such agreements were routinely renewed. Pirtle was also unable to identify any dealer whose agreement had not been renewed when it expired. Moreover, right up until the time that JPMI's supply of automobiles was reduced, Chevrolet, the assigned contract dealer, rated JPMI as satisfactory in all areas of its performance. This was also true of Buick. In fact, JPMI received an outstanding dealer award from Buick for maintaining high standards. (Plaintiffs' Exhibit No. 204). Thus there was sufficient evidence to permit the calculation of damages past the contract's expiration date in 1985.

## CONCLUSION

There is evidence to support a jury finding of a dealer conspiracy and GM's participation in that conspiracy. There was evidence to exclude the possibility of General Motors' independent action and the evidence is sufficient to support a verdict under the per se standard as required by *Sharp*. There was also sufficient evidence to show that the conspiratorial activity caused injury to plaintiff and sufficient evidence through experts to demonstrate the amount of that damages. Thus, General Motors' motion for a judgment notwithstanding the verdict is denied.

Regarding the new trial issues, there has been no prejudice to General Motors. The curative jury instructions adequately eliminated such claims. The jury verdict is not perverse and claims that damages included prejudgment interest are erroneous. Therefore, defendant's motion for a new trial is denied.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. General Motors' motion for judgment notwithstanding the verdict is denied as it relates to John Peterson Motors, Inc.;

2. General Motors' motion for judgment notwithstanding the verdict is granted as it relates to Donald John Peterson;

3. General Motors' motion for a new trial is denied; and

4. Plaintiffs' motion for costs and attorney's fees is denied without prejudice.